Spring Term
1839.

# Whiting's Heirs *against* Taylor's Heirs and Others.

CHANCERY.

[Mr. Pirtle and Mr. Thruston for appellants: Mr. Hardin and Messrs. Crittenden and Oates for appellees.]

FROM THE LOUISVILLE CHANCERY COURT.

Judge MARSHALL delivered the Opinion of the Court.

*May 9.*

THIS bill was filed, in September, 1832, by the heirs of Thomas Whiting, against William Taylor and others claiming under him, to obtain a relinquishment of the possession and title of and in two tracts of land; the one of one thousand acres, granted to John Thruston, on the 10th of December, 1785, and the other of five hundred acres, granted to John Thruston, as trustee of Charles Minn Thruston, on the 4th of December, 1785.

*The bill—its allegations and objects.*

The complainants allege and prove that, the title under these two patents having been vested by descent in John L. Thruston, he conveyed the same, in 1795, to their ancestor, Thomas Whiting, who in the same year departed this life, leaving some of them infants, and all of them then and still non-residents of the State of Kentucky. They further allege, in substance, that, within a few years thereafter, the defendant, William Taylor, residing near the said lands, assumed, either voluntarily or at the request of some of their friends or connections, the agency and control thereof, for them; that, in the exercise of such agency, he placed tenants on the land, to open and improve and hold it for them; that he received, from such tenants, the rent of the land for many years, amounting to a large sum, and held it in possession for them, for many years, purchasing for their benefit, one or more interfering titles, until, at length, intending to defraud them of their land, he converted his friendly possession into a hostile one, fraudulently covered the land with Kentucky treasury warrants, which he caused to be patented to himself; claimed it as his own, and refused to deliver the possession to them. That, in consequence of this, they employed one George W. Kinney, as their agent, to commence and prosecute for them the necessary suit or suits for

the recovery of the land; that, in 1821, their agent commenced an action of ejectment, in their names, for the land embraced in the patent for 1000 acres, in which Taylor was a defendant, and that a judgment having been recovered by them, in said action, and the same having been reversed by the Court of Appeals, for some error, and remanded for a new trial, Taylor gave their agent, Kinney, a large sum of money, ($500,) not to proceed with said action, and to suffer a nonsuit, which he, for said sum, agreed to do, and actually did do; and that, knowing that the complainants were residents of the State of Virginia, and being largely their debtor, for rents received, as their agent, as aforesaid, Taylor caused the execution against them for the costs of the reversal in the Court of Appeals, amounting only to forty nine or fifty dollars, to be levied on the said 1000 acres, which they allege to have been worth twenty thousand dollars, and purchased the whole of it for the amount of the execution. They further allege that, they did not know that Taylor had bought up their agent, or their land, until the time for redeeming the land according to law had expired; but that John P. Thatcher, a friend of theirs, tendered the money necessary for a redemption of the land, immediately after the sale.

On the ground of the alleged agency of Taylor in regard to the land, and a trust arising therefrom, and also on the ground of fraud in his purchase of the tract of one thousand acres under the execution for costs, and in his buying up their agent Kinney, and thus procuring his abandonment of their suit and their interest, of all which they charge the other defendants with notice before they acquired any interest under Taylor, they pray for a surrender of the possession, a relinquishment of all the claims which Taylor has acquired on the land, an account of rents &c., and for general relief.

Taylor denies, in his answer, that he ever acted, or was employed, or assumed to act, as agent or trustee for the complainants, or any person under whom they claim, in regard to the said land. He denies that he ever took possession of it, or put others in possession of it for them, or that he ever leased it out as their land, or in

their names, or for them, or that he ever received the
rents of any part of it for them. He alleges that he
took possession of it in the year 1807, for the first time,
and that he then took possession for himself, under a pur-
chase of William May's patent of 1000 acres, issued on
the 2d day of December, 1785, which he purchased for
himself; that he, also, purchased for himself, the inter-
ference of James Knox's patent, dated in April, 1796,
with the land now claimed by the complainants, and
that, without any view to defraud the complainants, but
for the purpose of avoiding the expense and trouble of
establishing the lines and corners of some of his own
claims in the neighborhood, and of taking up some va-
cant land which was supposed to lie between them, he
located two Kentucky Treasury warrants, and had them
patented to himself, in 1816 and 1821; which, together
with the other claims acquired as above, cover the whole
of the land in controversy.  He further alleges that, not
knowing the exact position of the two tracts claimed by
the complainants, and fearing that they might interfere
with his claims aforesaid, he acquired from M. Hardin,
the benefit of his purchase of both tracts for taxes, un-
der the laws of the Congress of the United States, and
obtained a deed therefor, from the Collector for the State
of Kentucky; and for the same reasons, and also as the
means of reimbursing his costs in reversing the judg-
ment in ejectment, obtained against him, as above sta-
ted, he had caused the execution for said costs to be lev-
ied on the tract of 1000 acres, and, being the highest
bidder, became the purchaser.  He denies fraud in each
and all of these transactions, and especially in the pur-
chase under execution, which he alleges to have been
fair and legal; and he denies that there was ever any
tender of money for the redemption of said land by
Thatcher or any one else.  "He denies that there was
any such corrupt agreement between him and G. W.
Kinney, as is alleged in the bill."  But says that he had
been much harrassed by Kinney, who represented him-
self as the agent of Whiting's heirs in prosecuting the
ejectment suit, and, to buy his peace, as well he might,
he did give him some claims on other individuals,

amounting to between four and five hundred dollars; for which Kinney agreed never to intermeddle, as agent or otherwise, to stir up pretended claims with which to harrass the respondent, as he was threatening to do, and was getting other agencies, and harrassing the respondent with other pretended claims.

He exhibits the evidences of his various titles as claimed in his answer, and relies upon them all, as a complete protection against the claim of the complainants.

He relies also upon the statutes of limitation, of twenty years, and of seven years, and upon the lapse of time operating on his possession, and on the staleness of the complainants, claim.

*Answers of other defts.*

The other defendants, of whom the greater part appear to have been mere tenants under Taylor, denying knowledge of the material allegations of the bill, refer to and rely upon Taylor's answer, as setting forth their grounds of defence. Those defendants who claim title under him allege, also, that they are purchasers for a valuable consideration without notice, and exhibit their deeds.

*New parties admitted as co-complainants.— Taylor's death, and revival of the suit against his representatives.*

In the progress of the cause, in 1834, two persons not named as complainants in the original bill, and who seem not to have been named as lessors in the action of ejectment, but who are proved to be co-heirs of Thomas Whiting, were introduced as co-complainants. And Taylor the principal defendant having died before the hearing, his representatives were properly brought before the Court.

*Exhibits—including the record of an ejectment, in which the complainants got judg't for 1000 acres—the largest of the two tracts now in controversy, against Taylor; who reversed the judg't & sold their title—at an enormous sacrifice—under his ex'on for the costs, and purchased it himself —the eject. then still pending: after which, it was abandoned by collusion of the de-*

Numerous exhibits are referred to in the pleadings and form a part of the record; among which is the entire record of the action of ejectment, for the tract of one thousand acres claimed by the complainants; from which it appears, that the action was commenced in January, 1821, judgment obtained in 1823, and reversed in April, 1827; that the mandate was entered, and the cause re-docketed in September, 1827; that, on the 18th of August, 1828, the title of the lessors in that tract, was sold under the execution, for costs, and shortly afterwards, conveyed to Taylor, who purchased it for between forty nine and fifty dollars; that, at the September term, 1828, the ejectment was continued, and a dedimus awarded for taking depositions on the application of

Kinney, acting then as the agent of the lessors; that, at the same term, a rule was made upon the lessors for additional security for costs, to be given at the next February term. And that at the February term, 1829, no person appearing on the part of the plaintiff, and no additional bond or security for costs having been given, the suit was dismissed with costs.

Many depositions were also taken, which relate principally to the following facts: 1.—the derivation of title from John Thurston, the patentee, to the complainants, about which there is now no question; 2.—the respective ages and disabilities of the complainants; 3.—the position of the two surveys, of one thousand, and five hundred acres, patented to Thurston and claimed by the complainants, and of the survey of 1000 acres patented to May, and claimed by the defendants—in elucidation of which, several plats and reports of surveys are also filed; 4.—to the possession of the land claimed by the complainants, as embraced in the patent to Thurston for 1000 acres, and especially, to the acts or agency and declarations of Taylor, with regard to the possession and ownership thereof; and, 5.—the deposition of George W. Kinney relates chiefly to his agency in prosecuting the action of ejectment for the complainants, and to the arrangement between Taylor and himself, by which that agency was determined.

On the hearing of the cause, the Chancellor, being of opinion that the complainants had established no ground of equitable relief as to any part of the land, and that, as to the tract of one thousand acres they were barred of all remedy at law or in equity, dismissed their bill as to that tract absolutely; but being of opinion that, they might be entitled to maintain an action at law for the five hundred acre tract, the bill as to that was dismissed without prejudice to such remedy. The complainants appeal from the whole decree.

As all the documents of title exhibited by either party, are of a purely legal character, the complainants, who are out of possession, have no right to claim the equity depends upon their establishing a trust or fraud in relation to the land in controversy; and, as to one tract (500 acres,) for which there was no ejectment fraudulently defeated, and which was not sold under execution, and as to which *no* fraud, or trust, is made out in proof, the bill was properly dismissed, without prejudice.

---

*Margin notes:*

Spring Term 1839.

Whiting's Heirs
vs
Taylor's Heirs.

fendant, & pltfs'. agent.

Depositions.

Decree of the Lou. Ch. Court and appeal.

The title exhibited by the complainants being of a purely *legal* character, their right to relief in

Spring Term
**1839.**

*Whiting's Heirs*
vs
*Taylor's Heirs.*

To sustain a collector's deed for land sold for U. S. revenue, and make it available as a defence to an eject. upon another title, there must be proof that the sale was made in conformity with the act of Congress.—The existence of such a deed, without such proof, will not authorize the interference of a chancellor to remove it, as an obstruction to the legal remedy.

Where a party in possession as agent, obtains an adverse title, and attempts to hold for himself, the remedy of the owners is at law: it is not a fact that will give the ch'r jurisdiction.

aid of the Chancellor, and have in fact made out no case for his jurisdiction, except so far as they have established against Taylor, a trust affecting the land, which a court of equity will enforce in their favor, or a fraud against which it can give them redress. Bringing the claims of the complainants to this test, their case in relation to the five hundred acre tract, stands upon very different grounds from that in relation to the one thousand acres. For although the bill makes no discrimination between the two tracts in its allegations of agency and trust, the proof does not apply with equal force to both. And as to the five hundred acres, there was no ejectment brought and dismissed in consequence of the alleged fraud of Taylor, and no purchase by him of their title under execution. And although the collector's deed for the taxes, purports to convey both tracts to Taylor, yet as it was set up by him, without effect in the trial of ejectment for the other tract, and as it has been properly decided by the Chancellor in this case, to be of no avail for want of proof that the sale was made in compliance with the laws of Congress, it can scarcely be considered as presenting any obstruction to the legal remedy of the complainants, and does not constitute a sufficient ground for asking the aid of the Chancellor, for the purpose of putting it out of the way, or of recovering the possession of the land. Their title derived under J. Thruston's patent for 500 acres must be regarded as still remaining in them, and it is the oldest upon the ground. Their legal remedy appears to be free from any obstacle, or if there be any, it is not shown to be one which should be less regarded in equity than at law. And if it were true, as alleged, that Taylor took possession of this tract for them, and then claimed it as his own, in violation of his trust, this would seem to be no more than the ordinary case of a tenant committing a breach of his fidelity by setting up an independent title in himself, and such a breach of trust is not of itself deemed a sufficient ground for appealing to a Court of Equity for the recovery of the possession. And there is no such necessary and indissoluble connection between their claims to the two tracts, as that either

must of course be drawn into the same forum which takes jurisdiction of the other. We concur, therefore, with the Chancellor in the opinion that, as to the five hundred acre tract, the complainants had no ground for coming into equity.

As to the tract of 1000 acres, the title of the complainants between whom we need not here discriminate, having been sold and conveyed by the sheriff, they are under the necessity of avoiding the effect of that sale and conveyance, before they can successfully assert any claim to the possession of the land, at law or in equity. And we are of opinion that, if by direct proof of fraud in that purchase, or of other fraud on the part of Taylor against them, they have shown a right to avoid the sale, or to have a reconveyance of their title, they are not only entitled to be restored to their title, but also to a decree for the possession, except so far as Taylor has shown that he has a better title, which he is at liberty to set up against them, or an independent adverse possession, sufficient, under the statutes of limitation, to bar their claim to the land.   If, at the time of that sale, their title was not available for the recovery of the possession, it would seem that they could not be put in a better condition by any fraud affecting merely the validity of the sale, or Taylor's right to hold the title derived from it; and in such a case, the Chancellor might perhaps refuse to perform the nugatory act of restoring to them a mere empty and fruitless title.   The distinction here taken between the extent of the decree against a fraudulent purchaser under execution where he has, and where he has not, a paramount title in himself at the time of the purchase, is recognized in the case of *Blight's Heirs* vs *Tobin*, 7 *Mon.* 612, and seems to us to be reasonable. It is founded on the principle that, even in punishing fraud, the Chancellor will do no more than restore the injured party to no more than his right; and that, having possession of the case for this purpose, he will not leave him to the embarrassments and difficulties of another litigation for the establishment of his right, but will, at once, do full justice between the parties.   If the title of the complainants, when it was acquired by

*Margin note:* Where a party goes into ch. to have a sheriff's sale set aside, if it appears that he is entitled to have the title that was sold conveyed to him, in consequence of fraud on the part of the purchaser, in the sale, or otherwise, he will be entitled to a decree *for the possession*, also: unless the deft. sets up another and better title, or shows an adverse possession, of such duration as the statutes of limitation will protect. But—If the compt. at the time of the sale, had not a title on which he could recover the possession at law, the ch'r will not give him the possession. If, when the fraudulent title which obstructs the recovery at law, is removed, the compt. can recover in eject. the ch'r should decree the possession: otherwise, not.

VIII. 52

Spring Term 1839.

*Whiting's Heirs*
vs
*Taylor's Heirs.*

Taylor, and when this suit was brought, included the right of possession, and if, on the ground of fraud, he is properly compellable in equity to re-convey the title, the re-conveyance must carry with it the same right of possession, and he would certainly be subject to immediate eviction by action of ejectment. We can perceive no good reason why the Court should not give full effect to the acquitable remedy, by enforcing the right of possession in a case of that sort, as it does in other cases in which the holder of an equity seeks relief against the holder of the legal title in possession.

A court of law has jurisdiction to set aside an ex'on sale, for fraud: and courts of equity have, also, jurisdiction of the same matter, which, tho' concurrent, not exclusive, is nevertheless, independent, & plenary; so that when it once attaches, a complete remedy may be afforded; for whenever the rights of the parties can be ascertained by the chancellor, they may be effectually secured by his decree.

It is true that, in the case of a purchase under an execution sale, which is voidable at law for fraud, the jurisdiction of the Court of Equity is concurrent, and not exclusive. But although concurrent, it is also independent; and when once it properly attaches to a case, is as plenary, and may be as effectual, as if it were exclusive. Indeed, one ground on which it takes jurisdiction in cases of this class, is, that its powers of redress are more ample than those of a court of law. And it would be inconsistent to suppose that, in such a case, its powers are restricted by the mere fact that a court of law might have taken jurisdiction of the same case, or that it might complete the redress which the court of equity has begun. But if the purchase under execution be not voidable at law, but in equity only, or if, though the purchase be valid, the purchaser be placed by subsequent facts under an equitable obligation to re-convey, the jurisdiction of the court of equity is exclusive, and if, upon the pleadings and proof, it can ascertain satisfactorily the respective rights of the parties, its power of redress must surely be co-extensive with the full measure of justice, and should be exercised to that extent.

Compts'. title to the one thousand acre tract — its corners & lines.

Applying these principles to the case of the complainants, as to the tract of 1000 acres, the first enquiry is— how far was their title to that tract available when it was acquired by Taylor? They were entitled to the patent of John Thruston, dated the 10th of December, 1785, and granting to him one thousand acres of land "on the waters of Floyd's fork, adjoining the lands of Robert Thruston, beginning on the line of said Thrus-

*Whiting's Heirs* vs. *Taylor's Heirs.*

ton, at a Hoopwood and Beech, and running south 20 E., 231 poles, at 20 poles, crossing a branch, and at 149 poles a fork of said branch, and passing Robert Thruston's corner, continuing the same course, and cornering at a hickory and white oak; thence N. 70 E. 693 poles, cornering at an ash, beech and dogwood; thence south (it should be north,) 20 W., 231 poles, at 180 cross a branch, and cornering at two elms and beech; thence S. 70 W. 693. poles, to the beginning."

Spring Term 1839.

*Whiting's Heirs* vs *Taylor's Heirs.*

This, so far as appears, or is intimated, in this case, is the oldest patent upon the land which it covers, unless the patent to William May, dated December 2d, 1785, covers the whole or a part of the same land.

That patent grants to William May, one thousand acres of land, "on the east side of the east branch of Floyd's fork, beginning at a dogwood and beech, about a mile from the mouth of said branch; running thence, S. 20 east, 231 poles, at 40 poles crossing a branch, and at 200 poles crossing another branch, cornering at an elm and ash; thence N. 70 east, 693 poles, to a white ash, gum and beech; thence N. 20 W. 231 poles, to an ash, dogwood and beech; thence S. 70 W. 693 poles to the beginning."

May's patent for 1000 acres—his corners & lines.

There is certainly nothing on the face of these patents indicating any interference between them. And, as the surveys on which they issued, were made by the same surveyor, and within a few weeks of each other, that of Thruston bearing date on the 7th of November, 1783, and that of May on the 10th of January, 1784, it might be presumed, in the absence of all evidence on the subject, that they were not intended to interfere. It is to be observed, too, that the length as well as the course of the corresponding lines of the two surveys is precisely

Two patents—each for 1000 acres, in a parallelogram (three times as long as wide;) the courses and distances of both precisely the same; the same surveyor made both, near the same time; and the presumption from that fact, is, that they were not intended to interfere, but to lie side by

side. So placed, the two exterior corners of each, are identified, and the lines connecting them, and forming a parallelogram containing nearly, but not quite, 2000 acres, the quantity of both surveys; but no dividing line is found. If neither that line, nor any marked corner for either end of it, could be found, each survey, being made upon its proper side of the large parallelogram, must be extended from the exterior side line, towards the opposite line, so far as to include the quantity; and, the area being insufficient for both, they would interfere in the middle, and the elder grant would take the lap. But, as some trees are found in one of the lines which forms one end of both surveys, which, though not marked as corner trees for these surveys, agree with the calls of the patents, and are not far from where the corner, for an equal division, would be, they are presumed to be the same called for in the patents respectively, as a corner of both surveys; and a line from thence, parallel with the side lines, is adopted as the true dividing line—and the more readily, as it gives to the elder grant about its full quantity, leaving the deficiency to fall upon the junior grant.

the same. So, that if the two surveys were accurately laid down, side by side, placing Thurston on the northern side, the first lines of the two would form one continued straight line, of 462 poles in length; the third lines would also form a line of equal length, parallel to the first, and the ends of these two lines being united, on one side by the fourth line of Thruston's, and on the other by the second line of May's survey, the whole would form a parallelogram, containing the two equal surveys, and divided by a line terminating at one extremity in the second corner of Thruston, and the first of May, and at the other extremity, in the third corner of Thruston and the fourth of May.

The facts upon the ground do not correspond precisely with this description, but they do so nearly, that this conformity, connected with the fact that the same trees in number and species that are called for as the third corner of Thruston's, are also called for as the fourth corner of May's survey, and with the additional fact that, all the objects called for in the two surveys, so far as they can now be ascertained, correspond more nearly with this position of the two, than with any other that can be given, leaves little room to doubt that this was substantially the position they were intended to occupy, and bring us satisfactorily to the conclusion that, so far as it is now a matter of construction, this position should be given to them, as nearly as the objects actually identified, as controlling their location and form, will permit. There is, in fact, upon the ground, an ancient boundary commencing in Robert Thruston's line, at a hoopwood and beech, (the former marked, and the latter too much decayed to ascertain its marks,) running thence the patent course, for the first line, with Robert Thruston's line, crossing a branch at 20 poles, and a fork of it at 150 poles, and passing said Thruston's corner at 143 poles, and continuing the same course to an ash, marked as a corner, at the distance of 450 poles; thence the patent course for the second line of May and Thruston, to a gum and beech marked as a corner, at about the termination of the patent distance; and it is proved that a white ash formerly stood here, marked also as a

corner. These trees are called for as the third corner of May, and we consider them sufficiently identified as such. Which identification, also, ascertains the ash, at the termination of the first of these lines, as one of the two trees called for as the second corner of May. From the corner at the white ash, gum and beech, the boundary referred to runs with the patent course of the third line, to a beech and elm, at the distance of between 445 and 450 poles, and thence the patent course, and about the proper distance of the last line to the beginning. This being identified beyond any rational doubt, as the first or beginning corner of John Thurston's survey, its relation to the beech and elm, together with other direct evidence on the subject, sufficiently identifies them as two of the three trees called for as Thruston's fourth corner. It appears too that the marks found upon these lines and corners, correspond in age with the date of the two surveys, and the clearing and improvements which had been made when the witnesses saw them, with other natural causes, account sufficiently for the absence of some of the trees called for. This boundary obviously includes both surveys, and is made up of their exterior lines and corners. But as the length of the first and third lines respectively, of the inclusive survey, is not equal to the aggregate length of the first and third lines respectively, of the included surveys as called for in the two patents, it is also manifest that the inclusive survey falls short of the quantity requisite to make up the two included surveys. And that, if (as must be the case if there be no object on the ground to indicate the actual position of the interior lines and corners,) the two included surveys are to be closed by giving to each its patent distance upon the first and third line, and uniting the opposite points at which this distance terminates, each of them will cover the same ground to the extent of the deficiency in the inclusive survey. And the consequence would be that, May's patent being the oldest, would hold this interference. Which, as the complainants have not, as we think, shown an equitable right to have a conveyance of the elder legal title derived from May's patent, would be the

same thing in effect as if it were found that in closing the two surveys, that of May had been actually run out to its full dimensions, and that of Thruston proportionally restricted. And although no trees are found upon the first or base line, corresponding with the second corner of Thruston, or the first corner of May, as called for in the patents, and no division or other interior lines corresponding with the age of the surveys, there are or have been, within the knowledge of the witnesses, at about the patent distance from May's third corner, an ash, dogwood and beech, the same trees in number and species, which are called for as the fourth corner of May, and the third of Thruston. It is true these trees are not properly marked as a corner to these surveys. But they appear to have been marked as a corner for an adjoining survey, made for Thruston, assignee of Hobday, the day after that of John Thruston, and by the same surveyor, and which calls for a corner at this place, in John Thruston's line, and runs with it, between this corner and the beech and elm before noticed as John Thruston's fourth corner. And it seems entirely probable that, the surveyor, having either marked these trees for the adjacent survey, while he was running out that of Thruston, or having so marked it on the next day, while running the adjacent survey, and having in fact marked no other division or interior corner on this line of the inclusive survey—intended to call for these identical trees, when he came to make up his certificate from his field notes, as the third corner of Thruston, and called for the same trees afterwards, as the fourth corner of May, when he determined to place May's one thousand acres by the side of Thruston's, and within the inclusive boundary first run off.

Whether any trees were actually marked at or near the terminating distance of the first line of Thruston's, or whether any were actually marked as the beginning of May's survey, it is now impossible to ascertain, nor is it very material. The identification of the division corner in the opposite line furnishes sufficient *data* for ascertaining the division corner upon the base line. And we are the more ready to adopt this corner and the line

running thence, which seems to have been recognized by Taylor, in conveying land, and in procuring his treasury warrant patents, as the dividing boundary of the two surveys, because, although it gives to that of May very nearly its true quantity, and throws nearly the whole deficiency upon that of Thruston, it gives to the holder of May's patent nothing more, and apparently not quite so much, as the elder patent would hold, if both surveys were extended so as to include the proper quantity.

Why the Surveyor should, when making Thruston's survey of one thousand acres, have run off a boundary evidently intended to include two thousand acres, may not be now susceptible of a satisfactory explanation. It is manifest, however, from his not calling for the trees marked as the second and third corners of this large boundary, in his certificate of Thruston's survey, that he did not intend that survey to cover the whole area, and that a part of the boundary actually run, was not run as the boundary of that survey. It seems certain, therefore, that he intended and expected to certify another survey of one thousand acres, as being included in the general boundary, and adjoining Thruston's on the south; and it may be presumed that, he expected to have, or he may have supposed that he had, another survey to make for Thruston, which might occupy this position. This presumption is somewhat fortified by the fact, that, in his certificate of the five hundred acre survey of Thruston, which was made on the 7th of November, 1783, and seems to lie on the southern boundary of this inclusive survey, he describes it as beginning at the South East corner of Thruston's one thousand acres, without naming the trees.

Without, however, undertaking or deeming it necessary to account for and to reconcile the inconsistencies and discrepancies which are exhibited in these surveys, and which may have been the natural, if not the necessary, consequences of the inconveniences and dangers of the period at which they were executed, we are satisfied, from the facts and considerations already stated, and from others which need not be detailed, that neither

the survey of Thruston, nor that of May, can be prop-
erly considered as including the whole boundary which
seems to have been actually traced by the Surveyor, at
the time when he executed Thruston's survey; and that
in the absence of all evidence fixing the actual position
of the interior corners and lines of either survey, the
first and third lines of each should be limited to the dis-
tance called for from the ascertained exterior corners;
but that there is enough in the case to show that the ash,
dogwood and beech above described, as situated on the
third line, are the trees actually refered to in the two
certificates, as the third corner of Thruston and the
fourth of May. And therefore, that these trees should
be taken as the division corner, and that the line running
thence, according to the patent course of May's fourth
line, and of Thruston's second line reversed, allowing
for the variations of the needle, should be taken as the
division line between the survey of Thruston and May;
that May's patent covers the land on the southwardly
side of this division line, extending to the southward ex-
terior boundary of the inclusive survey, and that Thrus-
ton's patent covers the land on the northern side, ex-
tending to the northern exterior boundary.

Recital of evi-
dence relating to
the possession of
the land in con-
troversy.

No part of the land thus included within Thruston's
patent, seems to have been sold or conveyed by Tay-
lor, but the whole appears to have been in the posses-
sion of himself or his tenants, at the commencement of
the suit, and to be still in the possession of his heirs or their
tenants. As to this land, the patent of Thruston being
the oldest, the complainants, as the proprietors of the
title derived from it, had undoubtedly the right of pos-
session at the time of the sale of their title under execu-
tion, and at the commencement of this suit, unless their
right was barred by a previous adverse possession. We
are brought, therefore, to enquire into the state of the
possession, as it appears upon the evidence in this re-
cord.

As elucidating this subject, it may be premised that,
with the exception of a small interference upon the east-
ern end of Thruston's survey, which was covered by
the junior patent of Knox, dated in 1796, there was no

adverse patent or survey upon any part of the land, until William Taylor, in December, 1820, caused a survey to be made, including all that was not covered by Knox; upon which survey, a patent issued to him, in July, 1821.

It may be further stated that, from a period at least as early as 1798, up to the commencement of this suit, William Taylor lived within about three miles of this land, and that he was a practical surveyor, extensively concerned as agent or owner in the land claims in that vicinity.

In the year 1798, three men by the name of Robins, settled very near to each other, within Thruston's patent. They were the first settlers on the land. Their immediate settlement was called after them, *Robin town*, and the tract was called the *Robin town* tract. Two of these settlers, Absalom and Jacob Robins, depose in this cause—the first as a witness for the defendants, the other for the complainants. Each of them claims to have been the first who settled there, and says the others settled on the same terms. Each states that, before making the settlement, he went to William Taylor: Absalom Robins says he went to inquire whose land it was, and states that Taylor said he did not know; that one Whiting, as he understood, claimed land in the neighborhood; it might be his, or it might not; but that he thought the witness might settle there, as the country was new, and a small improvement would be an advantage to the owner, and that he would intercede with the owner, when he should ascertain who he was, to have the witness put on the footing of a tenant. After remaining about six years on the land, this witness went again to Taylor to know what he should do with his improvement, when, as he says, Taylor told him he had nothing to do with it, but advised him to sell his good will to it, which he did not do, but gave his good will of it to Samuel Ellis; and says he has understood it was given up by him to Taylor, after the latter had purchased a claim on the land. In answer to an interrogatory on the part of the complainants, he says, Taylor told him to pick out the easiest place he could, and let the land belong to Whi-

ting's heirs, or who it would, he would intercede with them to give him a lease, or make it easy with himself, and he then settled. His brothers and other persons afterwards settled near him. He says he and the others were squatters.

Jacob Robins says that, on his first application—which he says was for permission to settle on the land —Taylor said he might go and settle on it, and clear away; that it belonged to Whiting's heirs, who he understood would not be of age, for twelve or thirteen years —that his brothers afterwards settled in the same way— Taylor telling them to clear so that their improvements might make one farm; that he considered himself as holding under Whiting's heirs, by permission of Taylor; and that after living there six years, he sold his improvement, for two years, to John Snell, by permission of Taylor. Both of these witnesses say the land was called the Robin town tract, and Whiting's heirs' land, while they lived there.

Samuel Ellis states that, he settled on the place which had been occupied by Absalom Robins, and made a crop in 1806, paying the rent for that year to John Snell; that in 1807, he was going away, but Taylor told him if he would stay and cultivate the land he would allow or pay him for such improvements as he might make; that he staid, and paid Taylor the rent for that year—two barrels of corn per acre, for twelve and a half acres; that the place was within the bounds of what was called Robin town tract, or Whiting's heirs survey.

Daniel McAllister states that, he settled on the Robin town tract in 1805, on a place which was rented from John Snell, to whom he paid rent, for the year 1806; that he rented for the year 1807, from William Taylor, and paid him rent for that year—two barrels of corn per acre, worth about one dollar a barrel, for ten acres, and so on until 1809, with some allowance for repairs. This was probably the place opened by Jacob Robins. The same witness says that a year or so after he commenced renting, Taylor told him, the land belonged to Whiting's heirs, and that he had put the Robinses there to have a farm open for them; that this is his recollec-

tion and understanding of what he said. Upon an interrogatory by Taylor, he says Taylor did not inform him he had purchased the land from Carneal and May before he had rented it out. He also states that, the corner at the beech and elm (the fourth corner of Thruston's survey) was known to the settlers as the corner of the Robin town or Whiting's heirs' tract.

Charles Ellis states that he rented the places occupied by Samuel Ellis and McAllister, being about twenty five acres, for two or three years after they left, paying two barrels of corn per acre rent to Taylor; that, in 1806, he settled on a place, which he still occupies, in the survey of Thruston, assignee of Hobday, (being the survey before alluded to as cornering at the ash, dogwood and beech, in the third line of the survey now in question, and calling for and running with said line,) and that, expressing to Taylor a desire to purchase part of the adjoining land in what was called the Robin town tract, Taylor told him it could not be sold, it belonged to the heirs of Whiting. He also states that, when he first settled, in 1806, Taylor told him he had settled the Robinses there, at the request of some of the Thrustons, connections of the Whitings, or at Breckenridge's request—he does not remember which; and for the benefit of Whiting's heirs; that he purchased his land in the Hobday survey from the defendant Taylor. He did not hear Taylor say any thing of his purchase of the Robin town land from May and Corneal.

Wilson Maddox states that, he purchased land from Taylor, in the Hobday survey, in 1806; and that being chaffering with Snell about renting some of the Robin town tract from him, and Snell refusing to indemnify him against any claim of Whiting's heirs for damages on account of waste, he went to Taylor, who said he had no written authority, but had been spoken to by the Thrustons, or some of the connections of Whiting's heirs, to put tenants on the land for their benefit; that he had put the Robinses in possession, and that, if witness leased of Snell, the balance of his time, and Whiting's heirs should complain, he would speak a good word for him.

Henry Smyser, deposing, as the other witnesses also did, in 1833, says that, more than twenty years before, Taylor told him he had put the Robinses on the land for Whiting's heirs, to have a farm open for them when they came of age. This witness, as well as others not named, knew the land at an early day as the Robin town tract said to be owned by Whiting's heirs.

Benjamin Logan, deposing in 1834, states that, Knox having conveyed to him all of his unsold lands in Kentucky, he, in 1814, agreed to convey to one Hinkle eighty four acres out of Knox's survey, before spoken of as interfering with the land now in controversy; which eighty four acres Hinkle had purchased from Lynch, who had made a contract for the land with Knox, but had failed to pay &c; that in consummating this arrangement, Taylor acted as the friend and agent of Lynch and Hinkle, and surveyed the eighty four acres; and that while on the ground on that occasion, he (Logan) asked Taylor what had become of the balance of Knox's survey, to which he replied, "that so much of it as interfered with Whiting's, or Whiting's heirs', land, which is six hundred and eighty five acres, he had, before that, purchased of Col. Knox, or rather had made him a present of a horse for said interference, as Whiting's claim was the best, and he had the management of Whiting's claims, and had possession for them, and that he merely got Col. Knox's interference to quiet his claim, or prevent afterclaps, or words to that effect." He believes these are Taylor's words, or as nearly so as any one could satisfactorily speak after such a lapse of time. He remembers the horse spoken of by Taylor, and says he was worth fifty or sixty dollars.

To understand the extent of the interference with Knox, as mentioned in this deposition, it is necessary to state that Knox's western boundary line runs obliquely across the eastern end of Thruston's one thousand acres and May's one thousand acres and Thruston's five hundred acres, and that the impression seems at one period to have prevailed, at least in the minds of Lynch and of Taylor who was his agent in conveying the adjacent land on the western and southern sides of this block of

surveys, that Thruston's one thousand acre survey ex-

tended over the whole space included in the ancient boundary before spoken of, and that the five hundred acre survey joined it on the southern side. Hence, in the deeds conveying Lynch's title to the adjacent land on the west, the last of which was made by Taylor as his agent, in 1805, the whole line from Robert Thruston's corner, called for in John Thruston's first line, to the extreme corner of the five hundred acres, is referred to as Whiting's line. And hence the whole interference of Knox, on the eastern side of these surveys, is called the interference with Whiting's heirs.

This explanation will also aid in rendering intelligible the deposition of James Neal, who states that, in 1809–10 or 11, he thinks in 1810, one Hughes, his brother in law, applied to Taylor to purchase a narrow slip between the land of the witness and the land called Whiting's heirs', and on Hughes' refusing to buy that strip, unless he could get some adjoining land on the opposite side of the line, Taylor said, as to this last, that it was not his to sell; that it belonged to Whiting's heirs, and that it was probable he would purchase it of them, and if so, Hughes should have the refusal of it. This conversation took place in the presence of the witness; who, by reference to the plat, describes the land spoken of, as lying within the eastern boundary of what we consider to be May's survey. It is also included in Knox's interference which had been previously purchased by Taylor, and this shows that Taylor did not consider that, in purchasing from Knox, he was acquiring a claim in opposition or hostility to that of Whiting's heirs.

It may also be stated, at this place, that George Miles, a witness for the defendant, who proves the white ash, gum and beech which we have before designated as the third corner of May, and which, as may be inferred from his deposition, was shown to him as such by Taylor, proves also, that Taylor shewed him the land adjacent to that corner, as being in May's survey; and his deed to the Bank of Kentucky, conveying five hundred acres, extending from that corner to the place which we have designated as the fourth corner of May, describes the

land conveyed as being a part of May's survey. While, in apparent inconsistency with these facts, the survey of 1816, on which Taylor's treasury warrant patent of that year was issued, and which was evidently intended to include so much of the five hundred acre survey, and of the adjoining one thousand acre survey, as was not covered by Knox, calls, at the western end of the interior line of this survey, for the southwestern corner of May, which, if not a mistake (for the north west corner,) would seem to indicate the supposition at that time, that May's survey lay upon the north side of this interior line, and covered the Robin town tract. But this supposition, if it existed, would not change the fact, nor does this call in the patent prove, that the supposition actually existed.

Two other depositions for the complainants remain to be noticed.

John Talliaferro states that, in 1817, he called upon Taylor, for information in regard to this land, in company with and at the request of the complainant Baggot, who had married one of Thomas Whiting's daughters. The witness seems not to have ascertained who was in possession, but says, in answer to an interrogatory by the complainants, that Taylor refused to give possession to him, because he did not recognize his agency, and that he refused to give it to any body until all arrearages were paid by Whiting's heirs. He says that, in the interview spoken of, Taylor offered Baggot five hundred dollars for the claim of Whiting's heirs, *as it interfered with him a little.*

John Keating, deposes that Taylor told him he had been sued for Robin town, and in answer to the inquiry how it would go, said he knew of one thing against him, that he had told his overseer to be very particular in measuring that crib of corn, that it had come off of the land of Whiting's heirs.

In opposition to this body of testimony—of which the different portions, though of unequal weight, all tend to the same conclusion—we have the testimony of three witnesses, besides Absalom Robins, who say that the Robinses, and perhaps the other early settlers, were

squatters. Absalom Robins says further, that while he was on the land (which he left in 1804 or 1805,) Taylor, after being out surveying, said he was mistaken in supposing this was the land of Whiting's heirs; that if they had any land in the neighborhood, it lay in the fallen timber, or as he afterwards intimates, to the westward. And that he understood that, in 1805 or 1806, Taylor had purchased a claim to the land, and had had it in possession ever since.

Another of these witnesses, Jesse Oglesby, who had purchased from Lynch, and resided on a small tract of land adjoining the western boundary of these surveys, which is called for in his deed as Whiting's line, and whose land abutted upon both the surveys, as we have located them, says that, in February, 1807, Taylor told him he had purchased the Robintown land from William May and Thomas Carneal, and, at the same time, requested the witness to take possession of the part adjoining him, to prevent trespassers from destroying the timber; which he did, and had the liberty of using some of the timber and firewood, which he did; and he proceeds to say—"when Taylor purchased, as he told me, he took possession, and has been in possession ever since, and has made many valuable and lasting improvements on the same." He heard the land called Whiting's heirs' land. And this is all the oral testimony on the part of Taylor, which bears upon the question of possession: except that it appears that, at some period not designated, but before the action of ejectment was brought, he had settled some of his children upon the land.

The written documents exhibited by Taylor, show that, on the 30th of June, 1807, he purchased from Thomas Carneal one undivided half of May's one thousand acres, that, in December, 1809, he received a deed from Carneal for that half, and that, in January, 1811, he received a conveyance from May of the other half; which is the only evidence of his purchase from May. That, on the 15th day of August, 1808, he received the conveyance from Knox, which is the only evidence of that purchase, except his statement to Benjamin Logan,

VIII. 54

in 1814. In May, 1816, he caused his first treasury warrant claim to be surveyed, and in December following, obtained the patent. Attributing this act to the motive assigned by himself in his answer, it is difficult to perceive how this patent could have dispensed with the necessity of establishing the lines and corners of May's 1000 acres, unless it was intended to include it: and he does not appear to have had any other claim which could have derived such aid from it; nor any which could have authorized the reference to this land, as being vacant land lying between his lands. The single call, which is inconsistent with the idea that he intended to include it as May's survey, has been before noticed. In December, 1820—a few days before the commencement of the ejectment against him—he caused his second treasury warrant to be surveyed, and, in July, 1821, to be patented—covering so much of the Robin town tract as was not covered by Knox. He must have known that this patent would be utterly ineffectual as a defence in the ejectment suit, and what advantage he expected to derive from it, we need not conjecture.

There are many facts which go to establish fully the conclusion that, as early as 1807, Taylor must have known, and that he did know, not indeed with the knowledge of an eye witness—which may be the degree of knowledge which he intends to deny in his answer—but with all the certainty which a subsequent observer might attain, and with that knowledge which satisfies the conscience and governs the conduct of men, that Thruston's survey covered at least the northern part of the area included within the ancient boundary which we have noticed, and that it included the Robintown tract. He could not have been ignorant of the natural objects called for in Thruston's first line, and which fix his beginning, with almost mathematical precision, at the hoopwood and beech. He must have known that that line, including and binding on the Robintown tract, was referred to in the deeds of Lynch, whose agent he was, as Whiting's line. He was the owner of the adjoining survey on the opposite side of

Spring Term
1839.

Whiting's Heirs
vs
Taylor's Heirs.

the Robintown tract, calling for Thruston's line, and thus identifying its position. The corner at the extremity of this line, and the line thence to the hoopwood and beech, were notorious to the settlers in Robintown, as Whiting's corner and line, and it cannot be presumed that he was ignorant of them. It may be inferred, too, that he was the joint proprietor of an original survey executed before 1790, in the name of B. Netherland and William Taylor, which binds upon and calls for this line as a line of Thruston's one thousand acres.

Other circumstances of a similar tendency with these, need not be here repeated. It would be doing violence to all the facts, to wrest Thruston's survey from this position, and no reasonable man acquainted with the facts which Taylor must be presumed to have known, could have entertained a rational doubt but that, whatever might be its abuttals on the opposite side, it was fixed on this side, by the line and corners to which we have referred. Several witnesses must be forsworn, or it is proved that he acknowledged, and indeed declared, that this land belonged to Whiting's heirs, the proprietors of Thruston's title. And as to May's survey and claim, with the probable chance of establishing which, Carneal's bond to Taylor states the latter to have been acquainted: its descriptive call, to lie on the east side of the east branch of Floyd's fork, and to begin about a mile from the mouth of said branch, gives it no precise or certain location. This call would not lead to the beginning. No corner as called for, is actually found marked as the place of beginning, and there is nothing to identify the position of the survey, or to prove that it covers any part of the land included in the ancient boundary before referred to, except the ash, gum and beech identified by Taylor's own witness, as the third corner, and the other two corners which, though but partially identified, are made sufficiently certain by their relation to the ash, gum and beech. And not only do these objects fix the survey on the southern line of the inclusive boundary, but to extend it northwardly, so as to begin at the hoopwood and beech, and make it include, either the whole of the intervening

Spring Term
1839.

Whiting's Heirs
vs
Taylor's Heirs.

area, or only so much as is covered by Thruston's survey, would place the beginning within fifty five poles, instead of about a mile, from the mouth of the branch which, upon that construction of the survey, must be understood as the one called for.  So that it would be doing violence to the facts, with which Taylor was acquainted, either to remove this survey from the southern boundary to which we have refered, or to extend it from that to the northern line of Thruston.  And it is worthy of remark, that, while Taylor has specifically pointed out a corner at the termination of the southern boundary and the land adjacent thereto, as belonging to May's survey, and while he has sold and conveyed a large portion of that land—describing it as included in May's patent, he has not sold or conveyed an acre within Thruston's survey; nor until the ejectment was commenced against him, has he ever pointed to a line or corner on the northern side, as belonging to May's survey; nor has he proved by any witness, unless it be proved by Jesse Oglesby, that he ever, before 1821, directly asserted that the patent of May covered the Robintown land.  Nor does he, in his answer in this suit, venture to assert that such is the fact, nor that he believes it to be so.  But alleging merely that, he took possession of it under his purchase of May's claim, in 1807, he sets up all his titles, including the purchase of the complainant's interest, as constituting the better title in him.

While, therefore, there may be some circumstances in the case, which indicate a desire to shift the position of May's survey, and perhaps that of Thruston also, or to extend the former so as to cover the latter, he had no pretext for believing that this could be done.   And these considerations, connected with his repeated declarations and acknowledgements that the land belonged to Whiting's heirs, satisfy us that he did not believe that May's survey covered the land to which the controversy is now reduced.   And that he did not in truth pretend to assert right to it, or to take possession of it as his, in 1807.

A man cannot be
divested of any

It is true, it has been decided, upon just and reasona-

ble grounds, that a man is not to be divested of a title which he has, either on the ground of his own opinions, or by mere parol declarations resting in the recollection of witnesses; and that the detail of such declarations, often the weakest kind of testimony, should, especially after a great lapse of time, be received with scrupulous caution. But it is equally true and just, and indeed it must be received as an essential principle, as long as the proof of facts shall be required as the basis of decision in Courts of Justice, that where a man has no title but such as he can make out by parol proof of his own acts and intentions, or of other unwritten facts and by presumptions arising therefrom, such claim of title may be rebutted, not only by parol proof relating directly to the facts on which he relies, but also by parol proof of his declarations accompanying or relating to the facts, explanatory of their nature and elucidating his own intentions. Such declarations are admissible for such a purpose, as long as they remain in the memory of the witnesses, and at however remote a period they may be detailed, they are capable, according to the degree of credit to which they may be entitled in the particular case, of controlling the whole question. The declarations of tenants, made while in possession, have been admitted to prove the nature of that possession, and under whom it was held, though the declarant was not himself a party, to the trial. Much more are the declarations and admissions of the party himself admissible against him, to prove the nature of his possession, and other acts resting in parol, by the effect of which and of the presumptions arising from them, he is attempting to defeat an undoubted legal title. According to our view of this case, no question arises as to the competency or efficacy of parol evidence, or parol declarations, to prove or to create a trust, express or implied, in regard to the title, which may be enforced.

At the period now under review, the complainants had the undoubted title, and the question is as to the efficacy of Taylor's possession to oust them of their right and confer it upon him. This depends upon the nature and quality of his possession and its duration. When

*Spring Term 1839.*

*Whiting's Heirs*
vs
*Taylor's Heirs.*

title that he has, by proof of his mere opinions, or parol declarations, in relation to his title or claim. But when a man can show no title but such as he can make out by proof of his own acts and intentions, and other unwritten facts and presumptions from them, his claim may be rebutted by parol proof of countervailing facts, and of his declarations accompanying or relating to such facts. So, where one relies upon possession and the statutes of limitation, proof of facts, declarations, or admissions, going to show the intention with which he originally took and held the possession—whether in his own right, or as the agent or friend of another—are admissible and effective.

did it commence? Was it independent and adverse in its origin? If not, when did it become so? and how long did it continue? These are all questions of fact, susceptible of proof by every sort of evidence by which other ordinary facts may be proved; and in regard to which the admissions of Taylor himself are certainly competent when offered by the other side. Moreover, these are the only facts essential to be determined in the enquiry, whether the possession of Taylor was such, as under the statutes of limitation, might bar the elder title of the complainants. And, as the title of Knox, acquired by Taylor after he got into possession, was entirely ineffectual by its own force to confer on him the ownership of the land, and could only become effectual when joined with such possession as would of itself, if of sufficient duration, have given right, that acquisition can only be taken as a circumstance indicative of Taylor's intentions, and from which, connected and compared with other circumstances, the conclusion is to be drawn as to the nature of his possession, and its efficacy to bar the title of the complainants. And in this view, it is manifest that, all the facts and declarations which go to show Taylor's knowledge of the rights of Whiting's heirs and of his own rights as acquired by the purchase of May's title or otherwise, being entitled to some weight in ascertaining his intentions, may have a material bearing in determining the question, as to his possession. What then was the nature of the possession which Taylor acquired in 1807, when, as he says, he took it, and when, as the facts show, he did in fact take the control of it, renting out the tenements and receiving the rents? We have the precise history of but two of the tenements on this land, but the proof shows that several persons had made improvements, and that there was, in 1806, from fifty to one hundred acres of land cleared. We take the history of the two tenements, up to that time, as an example of the manner in which the whole was settled; and as it devolves upon Taylor, who sets up an adversary possession against the legal title, to show the facts which constitute his adversary possession, we have a right to consider the whole question as

to the subsequent facts, as resting upon the proofs relating to these two tenements.

Previous to 1807, the land had been settled on by persons who, though in some sense properly called squatters, as they set up no title in themselves, and had no authority or contract from the owner, had yet settled on the land avowedly under the title, and for the supposed benefit of the owners, to open and improve it for them, and under the impression, which, before 1807, had grown into belief, and indeed certainty, that Whiting's heirs were the owners, as they in fact were.   These settlements were so made, not only with the privity of Taylor, but in part by his instrumentality and advice, without any assertion or show of authority, but merely as a person whose position in the country might enable him to have some influence with the owners when they should become known, and who seemed disposed to befriend the owner as well as the settlers.   In 1806, the period, during which the first settlers thought they might enjoy or control the possession as a compensation for their labor on the land, was about to expire.   And during that year, we find Taylor holding himself out to several persons who wished to rent or buy the land, not as having direct authority from Whiting's heirs, to whom he referred as the owners, to manage their interests, but as having been requested by some friend of theirs, to put tenants on the land for them, &c. and saying, what was substantially, though perhaps not literally, true, that he had put the Robinses there for the benefit of Whiting's heirs: thus setting himself up as the friend of Whiting's heirs, and the person to whom, in the absence of any agent actually authorized, individuals upon the land, or desirous of going upon it, would and should apply for information and permission.

During all this time, the possession was indubitably held for Whiting's heirs.   Suppose after these declara-

In 1798, and at various times afterwards, up to 1807, a party advised and permitted persons to settle upon the land of certain non-residents; & in 1807 he admitted tenants and received the rents —representing to them and others, that tho' not a duly authorized agent of the owners—who were infant heirs —he had been requested by their friends and relations, to act for them, and was acting as their friend to preserve and improve the land · &c.   for them.   But having, at some subsequent period, set up title in himself, and being sued in chancery, by the heirs; in 1832, for the land—still held by him, he shows that, in 1811, he purchased an adjoining tract, under which he alleges he took possession of that in controversy; but it is evident that that title did not, and he must have known that it did not, cover the land in controversy.   In 1808, he acquired a title under a junior patent, to a tract

which interfered partially with that in controversy; but never settled any tenant on the interference, and said that the purchase was for the benefit of the heirs.   In 1820, he located a treasury warrant, and obtained a patent, including the residue, and proved that he had previously, settled some of his children on the land, but it does not appear when they took possession.   Upon these facts, with some minor circumstances, it is held that, the possession thus originally taken, *for the heirs*, by *their friend*—who was bound to show when his possession became hostile, cannot be deemed to have been so, previous to the location of the treasury warrant, in 1820, and the limitation did not, till then, begin to run in his favor.

tions, Taylor without setting up any claim to the land, had gone upon it himself, at the end of 1806, when the time claimed by the Robinses had expired—could it have been implied merely from this fact, that he, who was avowing himself as the friend and *quasi* agent of the owners, had taken an adverse possession? We think it could not. But this he did not do. He rented it for the year 1807, to Samuel Ellis and Daniel McAllister, who had occupied two tenements for the year 1806, under the *quasi* right of the Robinses, which was then to terminate. Could their renting from him—who had held himself out as the friend of Whiting's heirs, requested by their connections to put tenants on this land, and who did not pretend to set up claim to it himself— be considered, without proof, as an attornment to a hostile claimant, or as changing the nature of the possession? We think not. Did he then say to either of these men, that he claimed the land as his own, either before or after they rented of him? No such thing is shown to have occurred. But while McAllister remained on the land, he told him it belonged to Whiting's heirs, and he had put the Robinses there for them. But it was on the 30th of June, in this year (1807,) that he made the executory contract for Carneal's interest, in May's claim. He had rented to these two men before the 30th of June. They rented for cultivation, as is evident from their depositions. Ellis was persuaded to stay in the spring. He was thinking of looking out for other land to cultivate, before the 30th of June. McAllister may have rented the fall before. Taylor did not pretend to rent or to set up any claim to this land, under his purchase from Carneal, while these men were there; and McAllister staid until 1809. Charles Ellis rented both these places afterwards, for two or three years. To him Taylor had made the declarations in 1806, as to the ownership of the land, and his agency in settling the Robinses there, and the request from Whiting's connections. He makes no different representation when he puts him on the land under rent; sets up no adverse title; pretends to no ownership. We again repeat that, there is no ground for inferring a hostile possession from this change of tenants, or

from any thing which occurred on the land, up to the expiration of Charles Ellis's term, which according to his statement may be supposed to have been in 1811 or 1812. The history of the possession is not attempted to be traced any further. It remained with Taylor and his tenants. And surely the circumstances under which he acquired the possession and control of the land, are not such as to induce the Chancellor, out of mere favor, to infer that he assumed a hostile attitude at such a period as might enable him to bar the title under which, and in avowed friendship for whose owners, he first took the possession. It is going far enough, perhaps too far, to admit that, as they had not in fact reposed any special confidence in him, as they had not by recognition of his assumed agency, established him fully in that relation, and as they may not even have known what he had done for them, he might, without any breach of actual trust or contract, have renounced his agency at pleasure. He could not have renounced it, at the same time retaining for himself the possession which he had acquired under the assumption of friendly agency, without a violation of moral, if not of equitable and legal duty. Such a change of attitude would not be presumed. And although it did at some time actually take place, it will not be fixed at any period not expressly designated by the proof, merely to favor him. Whenever it did occur, it could not have operated retrospectively, so as to make his previous possession, which was in fact friendly while it existed, avail him as an adverse possession under the statutes of limitation, nor so as to deprive the complainants of the benefit of the fact, that the previous possession was under their title, and taken for them. There must be proof to show when he assumed a hostile attitude, and when the statute should be applied in his favor.

The deposition of Logan rather authorizes the inference that, in 1814, Taylor did not claim the land as his own. He certainly made no avowal of hostility in 1817, when Talliaferro and Baggot applied to him. And there is nothing indicating unequivocally his indepen-

VIII. 55

*Spring Term 1839.*

*Whiting's Heirs*
vs
*Taylor's Heirs.*

Though a party who has assumed to act as the friend and *quasi* agent of non-resident land owners, might renounce the agency, at any time, without breach of trust or contract, he could not, at the same time, retain the possession of the land; nor can he make the possession, when it has become hostile, operate retrospectively, so as to make the statute of limitations commence before the possession became openly hostile, or deprive the owners of the benefit of the possession previously held for them.

Spring Term
1839.

*Whiting's Heirs*
vs
*Taylor's Heirs.*

dent claim to the land until he caused the treasury warrant to be surveyed upon it, in 1820.

It would seem probable, if not certain, that he had previously settled his children upon it, which might perhaps be deemed sufficient, but when this was done, does not appear.

And as to the purchase of Knox's title, which might seem to indicate the intention of appropriating a part of the land to himself, the fact that he did not, as appears, put any tenant within the interference, taken with his statement to Logan and other circumstances detailed in the evidence, indicate that the purchase of that title, which was entirely worthless, and which he seems hardly to have regarded as a *purchase*, was not intended as an appropriation of this land to himself, and should not therefore be deemed sufficient, in opposition to the tenor of the other facts bearing on the question, to demonstrate a hostility to the title of Whiting's heirs. Taylor had in fact received rents from the land, acknowledged to belong to Whiting's heirs, more than equivalent to the price paid for the whole interference. And, as we may presume, not being then hostile in fact to Whiting's claim, and knowing that Knox's would be entirely unavailing against it, he did intend nothing more than to quiet it.

Under these circumstances, we do not think the mere acquisition of this title can be taken as proving or making a hostile possession outside of its boundaries; and it does not appear when the actual occupancy of any tenant was extended to the land within them.

With regard to the testimony of Jesse Oglesby, his statement as to the time of the alleged conversation with Taylor, is sufficiently refuted by the documents, which show that the fact therein referred to—viz. the purchase from May and Carneal, had not been entered upon in February, 1807, and that it was not completed, so as to be spoken of as he says Taylor spoke of it, until January 1811. The most indulgent construction is to suppose that the witness named the former for the latter year by mistake. But placing the conversation in February, 1811, and admitting the truth of the statement, it would prove that Taylor had said to a man off

of the land, that he had purchased it, when in fact his
purchase did not embrace it, and could not, with any
plausibility, have been supposed to embrace it; and that
he had asked an individual not living on the land, to
take possession of it for him, when to those who were
cultivating and improving it, by his permission, he asser-
ted no claim, but had in fact admitted it to belong to
others, and presented himself to them as acting for the
absent owners. Neither this communication to Ogles-
by, if in fact ever made, nor his occasional use of some
timber and firewood, by Taylor's permission, on some
undefined spot, which may have been within May's
proper survey, could create any new possession in
Taylor or change the character of the previous posses-
sion, so as to admit of the application of the statute of
limitations.

There being then no definite proof of any such facts
as amounted to a disclaimer of the title of the complain-
ants, or would constitute a change of the possession, un-
til December, 1820, unless the presumed fact of Taylor's
having previously settled some of his children upon the
land, though not altogether unequivocal, should be deem-
ed a sufficient demonstration of previous hostility; and
the date of that fact itself being entirely uncertain, and
not ascertainable from any thing in this record, we could
not safely fix any period previous to that time, and cer-
tainly none previous to the year 1820, as the date from
which the statutes should commence running, even if
there were no disabilities on the part of the complain-
ants which would prevent their application as a bar.

But it appears that, in August, 1810, the complainant, Disabilities, of coverture and infancy, of some of Whiting's heirs. And, where several co-compl'ts sue for land, as co-parceners or joint tenants, the disability by coverture or infancy of *some* of them, will save *their* rights from the operation of the 20 years limitation law, and the rights of all from the 7 years law.
Francis Baggot, one of the daughters of Thomas Whi-
ting, then 16 years of age, married the complainant Bag-
got, both being still alive; and also, that, in 1809 or
1810, Mrs. Bernard, another daughter, died, leaving
three infant sons, who are complainants; of whom the
eldest did not come of age before 1817 or 1818; and it
may be presumed that, at least one of the other two,
(who were children of a second marriage) did not arrive
at full age until about the year 1828. And John Whi-
ting, a son of said Thomas, died in 1818 or 1819, leav-

ing an only son, Robert, one of the complainants, who was an infant when this suit was brought.  So that admitting Taylor's hostile possession to have commenced at any time after the expiration of the year 1810, (and there is no plausible ground for carrying it further back,) and admitting also, that the time running from the commencement to the termination of the action of ejectment, might be counted against those who were lessors of the plaintiff, which if the suit were defeated by the fraud of Taylor, we are not prepared to admit, still there were some one or more existing disabilities at the commencement of the adverse possession, which would have saved the right of some of the complainants under the statute of twenty years limitation, and would have saved the right of all from the bar of the seven years limitation act—which last act, however, could not on other grounds, have applied, as to a great portion of the land, until the Kentucky treasury warrant claim was laid upon it in December 1820; because until that time, there was no shadow of title in Taylor, for any part of it except to the extent of Knox's interference.  But if, as we have supposed, the proof in regard to the possession, does not lay a sufficient foundation for the application of either of the statutes before the year 1820, the twenty years limitation has not yet expired from that date, and the seven years limitation cannot affect this suit, because not only does the disability of Mrs. Baggot still continue, but that of Robert Whiting continued until after the commencement of this suit, and that of the Bernards, or at least of one of them, did not terminate until within seven years before they were made complainants.

Having thus come to the conclusion that the elder legal title of the complainants was not barred by the statute of limitations, either at the time of the sale under execution, or at the commencement of this suit, we are to enquire whether there is any legal or equitable ground for setting aside that sale, or for decreeing a re-conveyance of the land.

There appears to have been no omission of the legal requisites of a valid sale, and no proof of such fraud in the attendant circumstances, as would form the ground

A party professing to be a friend of certain non-resident  heirs, assumed an a-gency for preserving and improving their land, and having permitted settlers to settle upon and clear portions of it,     afterwards rented it, and received the rents, for several years.

of avoiding it in a court of law. There was, however, an enormous sacrifice in the sale; and as the defendants in the execution had undoubtedly the available legal title, and were the true owners of the land, which is estimated by witnesses in this cause, to have been then worth at least ten dollars per acre, and was valued by the appointed valuers, at the time, at six, this great sacrifice can only be accounted for, in the absence of all proof of Taylor's misconduct at the time, by assuming that bidders were deterred by his long possession, which might have been deemed or represented to have been hostile throughout, and by other embarrassments which he had thrown around the title. Considering, therefore, that the defendants in the execution were non-residents, absent from the state, and ignorant of the levy, and probably of the pendency of the execution, and that Taylor, knowing their title and all the facts, and having, moreover, received and appropriated to a much larger amount the rents of their land leased out by him as such, caused this execution to be levied, and the entire tract to be sold, and became the purchaser himself, for fifty dollars, we are not prepared to say that this might not be a case, if it stood upon the execution sale alone, in which the Chancellor should (as it is intimated in the case of *Blight's Heirs* vs *Tobin*, 7 *Mon.*, he might in some cases do on mere equitable circumstances) have the land set up again for sale for the amount of the execution, which would, in effect, be to set aside the previous sale.

But the case does not stand on these circumstances alone, nor on the question as to what a Court of Equity might do under such circumstances. The land was redeemable by law within twelve months, and it had been sold for so small a sum that there could be little doubt of its redemption by the owners, who had once recovered a verdict and judgment for it. That judgment was reversed, merely on account of a deficiency in the proof to establish the derivation of title from John Thruston, the patentee, to the heirs of Thomas Whiting,

doned, neglected and dismissed. *Held*, that, upon all the facts of the case, taken together, the complainants are entitled to a decree for a conveyance to them of the title of the defendants, (heirs of the original defendant) and for the possession.

Spring Term 1839.

Whiting's Heirs
vs
Taylor's Heirs.

At length, he acquired some pretended titles to the land, & claimed and held it as his own. The heirs employed an agent to recover the land; who brought an eject. and obtained judgment for it. But the judgment was reversed—for some defect in the proof, which might have been supplied on a new trial—for which the case had been remanded. While it was still pending in the court below, and altho' the rents received by the def't, and still in his hands, exceeded his judgment for costs in the court of appeals, he, nevertheless, took out an ex'n for those costs, levied it on the land, sold the title of the heirs, and purchased it himself, at $50, when it was worth $6000, or more. The land was redeemable within one year: but the non-resident heirs relying upon their agent, were ignorant of the sale. The agent did apply to redeem, but was bribed by the purchaser, with $500, to abandon his agency: the land was therefore not redeemed, and the eject: was abandoned.

Spring Term
1839.

*Whiting's Heirs*
vs
*Taylor's Heirs.*

named as lessors of the plaintiff; the suit was still pending; the proof might, with reasonable diligence, have been supplied in time, as we know it has since been made out in this case. Satisfactory security for costs might, perhaps, have been given, as it has since been given, and the land might have been finally recovered in that suit, and upon the proof before us, we may suppose that it would have been. But the plaintiffs were non-residents, ignorant of the sale, unapprised of the necessity of redeeming their land, and probably in other respects ignorant of the condition of their interest as it stood involved in the suit. They depended upon the fidelity and diligence of an agent, whom they had a right to employ to commence and carry on their suit, and to do all things necessary and legal for its successful prosecution, including even the procurement of a sufficient person to become security for costs, which as non-resident suitors they were required to give. All this is implied in the general fact that, they as non-residents had employed an agent in Kentucky, to commence and prosecute suits for the recovery of their land. They had a right to rely on his doing all this, and especially on his communicating to them whatever became necessary to be done which he could not or would not do. If the opportunity of redemption, of which they were ignorant, should be lost, and the suit be unattended and unprepared in Court, Taylor might have expected to enjoy the land without further interruption.

To consummate this object, it appears from the allegations of the bill and the admissions of the answer already stated, that Taylor did induce the agent of the complainants, for the pecuniary reward of five hundred dollars, to abandon his agency, to betray the interests of his principals, and to cease harassing the defendant with this pretended claim of Whiting's heirs, for the recovery of their own land, which had been first occupied and improved for them, with Taylor's privity and co-operation, and of which he had himself assumed the control, and entered upon the possession, as theirs. The consequence was that the land remained unredeemed; the suit went unprepared, and when it came on in Court, it

would seem that not only no agent, but not even an at-
torney, appeared for the plaintiffs, and their action was
dismissed. If the deposition of the agent, Kinney, be
taken into consideration, it appears that he was in the
very act of tendering the money, when he was arrested
and seduced by the proposition which terminated final-
ly in his accepting the sum above named for abandoning
his trust. We do not, however, deem it necessary to go
beyond the bill and answer and the record of the eject-
ment. The act of Taylor, as appearing on the bill
and answer, is contrary to conscience and good faith.
He had, indeed, a right to buy his peace, but not by cor-
rupting the agent of his adversaries. As far as the
agent had or professed to have authority, he might have
dealt with him for the title of his employers. He had
no right to buy up the agent himself, and to make a
profit by seducing him from his fidelity.

This transaction ought not, in our opinion, to stand.
It was a fraud upon the rights of the complainants, ne-
cessarily tending to their injury; and they are entitled
in equity, to be relieved from all its consequences. If
these consequences had extended no further than to the
dismissal of their suit, and they had been thereby sub-
jected to any obstruction in seeking their remedy by a
new action, the granting of a new trial, would, perhaps,
have been the appropriate equitable relief. But they were
deprived of their title by the sale under execution, and
in consequence of their absence, and the corruption of
their agent, have lost the opportunity of redeeming it,
and there is no redress but by a re-conveyance. Tay-
lor has no right to say that the agent might not have
redeemed, or that the complainants would not have re-
deemed, if they had known the facts; or that they might
by the use of appropriate means, have ascertained the
facts in time. They were ignorant of the sale, and of
the necessity of redeeming, and he, by corrupting their
agent, cut off their appointed means of information and
of action. If he did not apprehend a redemption, why
did he give five hundred dollars to the agent to aban-
don his agency?

But although we entertain the opinion above expres-

Spring Term
1839.

Whiting's Heirs
vs
Taylor's Heirs.

sed in regard to the transaction between Taylor and the agent Kinney, we would not be understood as placing the relief which we think appropriate to the case, on that ground alone. But connecting that transaction with the sale itself, the great sacrifice of the land, the circumstances which led to it, and the whole conduct of Taylor in his attempts to appropriate this land to him-self, we are of opinion that the complainants are enti-tled to a re-conveyance of their land, and that for the reasons before stated, the possession should also be de-creed. As to the amount of the execution which Tay-lor bid for the land, the complainants have offered all that is required, in asking an account of rents. In that account, the claim for the costs of reversing their judg-ment may be adjusted, or it may be otherwise effectual-ly secured by the decree.

Some of the h'rs –who became co-comp'ts by an a-mendment made after this bill was filed—were not lessors in the e-ject. nor did their title pass by the execution sale; and they would, therefore, have had no right, in-dependently of their connection with the other comp'ts, to come into equity, to re-cover the posses-sion of their land: but, being connected in in-terest, and neces-sary parties to the suit—who would (if def'ts) have been enti-tled to relief up-on a cross bill— they are held to be entitled to the same relief as their co-comp'ts. Being entitled al-so, to an interest, as heirs of some of those whose land was sold un-der execution— they are, as such, and to that ex-tent, proper co-

In this investigation of the case, and in the conclu-sion founded upon it, we have made no discrimination between the original complainant and the two Bernards, who came in as co-complainants in September, 1834, and who not having been united with the others as les-sors of the plaintiff in the action of ejectment, and not having been parties to the execution for costs, were not deprived of their title by the sale and conveyance of the Sheriff and the fraud of Taylor. To the extent of that title, they would have had no right, independently of their connection with the other complainants, to come into equity merely to recover the possession of their land. But being jointly interested in the title which is brought into controversy, being necessary parties to the litigation in equity which Taylor's conduct has rendered necessary for establishing the title of their co-heirs, and their right to the same ultimate redress being fully ascer-tained, and being in fact identical with that of the other complainants, we are not prepared to admit that, after being kept in Court so long for the purposes of this suit, they should now be turned round to their remedy at law, and denied that relief at the hands of the Chancellor, to which they have shown themselves to be clearly enti-tled somewhere. If they had been made defendants they might certainly, upon a proper cross bill, have enti-

tled themselves to participate in the relief to be granted to the complainants, so far as it was necessary and appropriate to their case. And it seems to us, that they have not lost that right by coming in, at once and directly, as complainants. If, however, it be conceded that their right as defendants would be the consequence of their having been forced into the Court in that character, and that, having voluntarily become complainants, they must show a right to assume that character, in order to entitle themselves to relief, and if it be further conceded that, the intimate connection of their interest in the subject of litigation with that of their co-heirs, does not give them that right if they stood merely upon their original title as heirs of their mother, still they seem to be entitled to another interest, descended to them, in conjunction with their half brother, Thomas Prebble, one of the original complainants, from two of their half brothers, full brothers of said Prebble, who were united as lessors of the plaintiff in the ejectment, and whose title was purchased by Taylor under his execution. To this interest they have precisely the same equities as their co-complainants have; and being to this extent not only entitled, but compelled to come into equity, with the other complainants, for relief against Taylor, we have no doubt that they may be allowed to bring their whole claim in the same subject before the Court, and that they should be relieved to the full extent of their right in it. To refuse it would be to split up the subject in a manner not entirely consonant with the spirit and object of a court of equity, which having once possession of a case, delights to do full justice to all concerned, and to make a final end of the litigation concerning it.

With regard to the subject of rents and profits, which remains to be disposed of, we deem it clear that, in recovering a possession taken and for a long time held under their title and for them, the complainants are entitled to an account of the rents and profits, subject to all equitable deductions; and that although they cannot, against the plea of the statute of limitations, recover rents for more than five years before the commencement years, may be set off against any claim for improvements and ameliorations

Spring Term 1839.

*Whiting's Heirs* vs *Taylor's Heirs.*

comp'ts; & having that partial interest, they may bring in their whole claim, and have full relief, on that ground, as the controversy in chancery should not be split up.

The comp'ts are entitled to an account of rents & profits: which, however—against a plea of the statute of limitations--cannot extend back more than five years from the commencement of the suit. But the rent for previous upon the land.

VIII. 56

of this suit, they are entitled to set off the rents and profits of the previous years, and of the whole period as far as it may be necessary, against any claim which the defendants, or any of them, may have in equity, to be compensated for ameliorations to the land, or for improvements made upon it, in good faith. But as the case upon this branch of the subject is wholly unprepared for final adjustment, and does not ascertain the facts necessary for determining in detail, the precise principles on which the final adjustment should be made, or the rule by which the defendants should be compensated, if they are entitled to compensation, it will be proper, on the return of the cause, that the Chancellor should take the requisite proceeding for ascertaining the rents and profits, and waste or deterioration, and such other facts, as may be essential to the making up of a final decree on

-Mandate.

this part of the case. Wherefore, the decree dismissing the complainants bill, without prejudice, as to their claim to the tract of five hundred acres patented to John Thruston, on the fourth day of December, 1785, is affirmed: but the decree dismissing the bill as to their claim to the tract of 1000 acres, patented to said Thruston, on the 10th day of December, 1785, and as to the rents and profits thereon, is reversed; and as to these matters, the cause is remanded, with directions to render a decree in favor of the complainants and against the defendants, the heirs of William Taylor, deceased, for a conveyance of such title as they have in and to the land included within the said patent for one thousand acres: beginning at a hoopwood and beech (or the point where they formerly stood,) in Robert Thruston's line, being the beginning corner called for in said patent as herein before established, and running thence with Robert Thruston's line, and passing his south east corner, continuing the same course till it intersects with the division line between the two Kentucky treasury warrant surveys of said William Taylor, patented to him in 1816 and 1821, and before referred to; thence with said division line and the northern boundary line of the five hundred acres, conveyed by said Taylor, to the President Directors and Company of the Bank of Kentucky, by

deed bearing date the —— day. of —— 1830, and filed *Spring* Term.
in this cause, to the corner of said 500 acres in the
third or eastern boundary line of the surveys of John
Thruston and William May, as herein before establish-
ed, at or near an ash, dogwood and beech, or the place
where they formerly stood; thence with the line of said.
Thruston's survey (common also to the survey of Thrus-
ton, assignee of Hobday) to the fourth corner, where
formerly stood a beech and elm, and thence with the
fourth line of said survey to the beginning.   And to pro-
vide, in said decree, for a full surrender of the possession
of the above described land to the complainants.   And.
with further directions to ascertain the rents and profits.
and all matters equitably connected therewith, and to de-
cree finally thereon, according to Equity, and the prin-
ciples above indicated on this subject.  .But to dismiss
the bill with costs, as to all the defendants  not holding.
within the lines of the said John Thruston's patent as
above described.

By a petition for a rehearing, presented by Mr. Crit-       *June* 20.
tenden, of counsel for Taylor's Heirs, the opinion and
mandate in this case, were suspended, and remained un-
der advisement until  this day:  when the petition was
overruled—*Judge Marshall* announcing the decision, with.
a comprehensive *oral* response to the petition.   The
counsel who had presented the petition then intimated
to the court, that he had no desire, but was rather un-
willing, that the petition should be printed, and asked.
leave to withdraw it: which was granted; and the peti-
tion being thus withdrawn, its publication, as required.
by the statute, is impracticable.