# Waller, &c. *vs* Logan's Heirs; and Breckinridge *vs* the Same.

CHANCERY.

ERROR TO THE BULLITT CIRCUIT.

*Case* 111.

*Witnesses. Depositions. Writs of error. Frauds, statute of. Executors. Change of venue. Jurisdiction. Surveys and Patents.*

1844.
*October* 29.

JUDGE BRECK delivered the opinion of the Court.

The opinion in this case was suspended and a petition filed by Waller, &c. for a re-hearing, and suggestions for a modification, filed by Logan's heirs, to which the Court responded on the 27th June, 1845.—See responses.

IN 1836, Jas. D. Breckinridge instituted a suit in chancery, in the Louisville Chancery Court, asserting claim to an undivided moiety of 6,000 acres of land on the Ohio river, in the county of Jefferson, which had been entered and surveyed, and 5,000 acres thereof patented in the name of Mary Byrd, executrix of William Byrd. As the basis of his claim, the complainant relied upon an obligation from Mary Byrd to John May, in which she undertakes to convey to May one half of the land, which he can procure for the estate of William Byrd, deceased, more than 5,000 acres, for which he had obtained a warrant of survey in his lifetime, said May being at the expense of locating and surveying the same. The land to be obtained being in consideration of the military services of said Byrd, in the then last war—the obligation bearing date in February, 1780.

The case stated, and object of Breckinridge's bill.

The complainant relied upon this obligation as assignee of the representatives of Samuel Beall, to whom a portion thereof had been transferred by May, and as assignee of May's representatives as to the residue, except a fraction of May's interest in the 1,000 acre survey.

The heirs of William and Mary Byrd, and the heirs of William Logan, and numerous others, who were alledged to set up claim to the land under Byrd's heirs, and some of whom were alledged to be in possession, are made defendants. He prays for a conveyance of the title from

WALLER, &c.
vs
LOGAN'S HR'S.

Byrd's heirs, and for a division of the land in severalty, between him and those who might be entitled to the other moiety thereof.

Logan's heirs, in their answer, set up claim to 1,723 acres of the land under the heirs of Richard Graham, and also under Byrd's heirs. They make their answer a cross bill against the complainant, and all the defendants, (except themselves,) to his bill, seek a conveyance of the title of Byrd's heirs, and a relinquishment from the complainant and others, who set up claim to the 1,723 acres, and that they may be quieted in their title and restored to the entire possession of the land.

*Answer of Logan's heirs made a cross bill vs all the defendants to Breckenridge's bill except themselves claiming 1723 acres of the land.*

The claim of Breckinridge having been adjusted by a consent decree, as to all the land outside of Logan's 1723 acres, between him and a portion of the defendants, the case, subject to that decree, and the cross bill of Logan's heirs, came on and was heard.

*Consent decree of the Court below, between Logan's heirs & a portion of the defendants.*

The Court below was of opinion, that Logan's heirs had manifested a superior equitable claim to the 1,723 acres, and were entitled to the relief sought in their cross bill, and decreed accordingly. From that decree, all the defendants to Logan's cross bill, who were decreed to convey or relinquish to them, except Byrd's heirs, and the complainant, Breckinridge, have appealed to this Court, and Breckinridge prosecutes a writ of error.

*Decree for Logan's heirs on their cross bill in the Circut Court.*

In the review of this voluminous and complicated case, an enquiry will first be directed to the claim asserted by Logan's heirs, and which is sustained by the decree.

In May, 1820, James Bristow, at that time a citizen of the county of Shelby, Kentucky, and a speculator in land claims, purchased from William B. Page, executor of Mary Byrd, who was executrix of William Byrd, an undivided moiety of the 6,000 acres of land before referred to. In the deed executed to him by Page at the time, the right of May as locaator to a moiety, is expressly recognized. Of the consideration, which was $6,000, $3,000 were paid down, and a mortgage executed by Bristow, to secure the residue. It appears that George Waller was in some way connected with Bristow in his land speculations, and that George Woolfolk and Francis Jackson claimed also to be connected with him in this

*The nature of the claim of Logan's heirs.*

purchase from the executor of Byrd. The parties seem to have treated the purchase as one, in which each was entitled to an interest of one fourth, although there is exhibited no written evidence from Bristow to either of them in regard to their respective interests.

On the 10th of November, 1820, Bristow, Waller, Woolfolk and Jackson, made an arrangement with the late William Logan, then resident in the county of Shelby, in reference to the 1,723 acres of land in contest. Logan claimed at the time, a portion of the land embraced in the claim of Byrd, under the heirs of Richard Graham, to whom and his heirs, there had issued three grants, one for 400 acres, and two for 1,000 acres each. And of the land thus covered by Graham, or a portion thereof, Logan claimed to be in possession.

With a view to compromise the conflicting claims of Graham and the claim of Byrd, as acquired by Bristow, it was agreed that Bristow and his partners should relinquish to Logan all the right, title and interest, which they had already acquired, or might thereafter acquire to a defined boundary of the land embraced in the grants to' Graham, and also in the claim of Byrd, for which Logan was to pay at the rate of two dollars per acre, for all the land in the boundary over fourteen hundred acres. In conformity with this agreement, a written obligation was given to Logan, in which the obligors undertake to convey by deed of relinquishment, all the right, title and interest they had then acquired or might thereafter acquire to the land within a certain specified boundary, the conveyance to be made during the year 1821. It bears date the 10th November, 1820, and is signed by Bristow, Woolfolk, Jackson and Waller; but it seems Waller did not sign it till several years afterwards, and after the death of Logan.

This obligation constitutes the foundation of the claim of the heirs of Logan, as derived from the heirs of Byrd. Its validity is assailed upon the ground, that it was fraudulently obtained—was given without consideration—was not, in fact, a compromise, but a mere covenant to convey—and lastly, that it was not executed and delivered in the lifetime of the principal party to it.

WALLER, &c.
*vs*
LOGAN'S HEIRS.

A witness who had twice transferred his interest in a tract of land, but where the second purchaser had notice of the first, is a competent witness for the first.

Depositions taken by one party on cross interrogatories by the other, and three years after leave given the other party to re-take, and afterwards exceptions filed to the first—held that they came too late, and properly overruled.

Before we examine the merits of these objections, we will dispose of exceptions, taken in the Court below, to certain depositions, which have a bearing upon this branch of the case.

Several of the defendants to the cross bill of Logan's heirs, excepted to the deposition of Woolfolk, one of the partners of Bristow, and a defendant in the case, upon the ground of competency. The objection was overruled, and we think correctly. The witness had transferred his interest in the Byrd claim to Stillwell, and, as he states, with notice, and subject to the arrangement made with Logan. Upon this supposition, it is not perceived that he had any interest in the controversy, or if he had, that there was no preponderance on the side of the Logans. If he had sold without notice of the previous sale or compromise with Logan, he would probably then be responsible to Stillwell, and his interest would lie on the side of the defendants. In either event, we think he was a competent witness for Logan's heirs.

Absolem W. Waller and John P. Thatcher also excepted to the depositions of M. Hardin and several others, taken on behalf of Logan's heirs, for the want of notice. The depositions, with two exceptions, which will be noticed hereafter, were taken while the case was pending in the Louisville Chancery Court, and in conformity with the rules of that Court, upon interrogatories filed by the parties. Waller and Thatcher were defendants, and filed interrogatories. They seem to have made no objection, but to have acquiesced and conformed to the rules of the Chancellor, regulating the mode of taking depositions. The depositions, with the exception of Woolley and Jesup, were taken in 1837. In September afterwards, of that year, these defendants, with others, obtained an order to re-take the depositions, which had been previously taken, and to which the exceptions under consideration were subsequently filed. No exception was then taken, nor objection made in any way to the depositions, which had been thus previously taken on behalf of the Logans. In April, 1840, nearly three years afterwards, and after the case had been removed to the Bullitt Circuit Court, Waller and Thatcher file ther exceptions. Without stopping

to examine the question, whether the Chancellor was authorized to establish rules for taking depositions, which would supercede the necessity of notice to the opposite party, we are very clearly of opinion, the exceptions in this case were properly overruled, upon other grounds. After acquiescing and conforming to the rules prescribed by the Chancellor, and obtaining an order to re-take the depositions, without any indication of dissatisfaction as to the manner in which they had been taken, or objection for want of notice, the exception filed nearly three years afterwards, comes too late. The previous acts of the party, not only indicate an acquiescence as to the mode of taking them, but amount to a waiver of any objection upon the ground of notice. To sustain the exceptions made, such circumstances, would be countenancing a course utterly inconsistent with that fair and liberal practice which ought to characterize the conduct of litigants in a Court of Equity.

As to the depositions of Woolley and Jesup, taken in 1839, and after the removal of the cause to the Bullitt Court, they merely prove the names of the heirs of Graham, a matter of little or no importance, so far as it has any bearing upon the defendants, Waller and Thatcher. Besides, it appears that Woolley was cross examined by George W. Kinney, who is himself a defendant, and agent or attorney for others. The exceptions were properly overruled, therefore, except as to Jesup, and the failure to sustain them as to him, cannot be regarded as ground for disturbing the decree, as the facts proved by him are sustained by other testimony in the cause.

An error of the Circuit Court in excluding a deposition will not authorize a reversal where the fact proved by the witness is sufficiently proved by other witnesses.

Having disposed of these exceptions, we will now return to the obligation from Bristow and partners to Logan, and notice the objections raised to it by the appellants.

It appears that Bristow died in 1821, and Logan a year or two afterwards. No objection appears to have been ever made by Bristow to this obligation, or to the compromise, as it seems to have been termed and regarded by all parties. Nor was any dissatisfaction ever expressed in reference to it by either Woolfolk or Jackson, nor by Waller, till long after the death of Logan. The depositions of Woolfolk, Jackson, and Waller, in regard to

WALLER, &c.
vs
LOGAN'S HEIRS.

the arrangement, are in the record. There is also much other testimony bearing upon this branch of the case. But without laboring through a tedious analysis and argument of the facts in the record, bearing upon the point in question, we deem it sufficient to say, that a careful examination of all the testimony, has resulted in the conviction, that the arrangement between Bristow and partners and Logan, was at the time, clearly understood by all the parties; that it was fairly made, in good faith, and free from fraud or circumvention; that Logan, at the date of the obligation of Bristow &c. executed his obligation to them for the performance of his part of the contract, which we think has been performed.

We come also to the conclusion, that although the obligation to Logan was not signed by Waller at its date, not being present when it was drawn up and signed by the other parties, yet that he was a party to the whole arrangement, and agreed to abide by it; that his failure to sign it till after the death of Logan, did not affect its validity as to those who signed it at its date; and that by subsequently signing it, he gave efficacy to the instrument as to himself. It was a written recognition of his parol agreement and undertaking, and in that view at least, the obligation is binding upon him in a Court of Equity.

*Contract between Bristow &c. and Logan, deemed free from fraud, and tho' not signed by Waller till after the death of Logan, it was, when signed, a recognition of his previous parol agreement, and binding from the date of the parol contract which it confirmed.*

But as further evidence of the claim of the appellees, they rely upon a deed made to them by Woolfolk, Jackson, and Waller, and by the representatives of Bristow in 1826, to consummate the agreement with their ancestor of November, 1820. This deed was executed on the 2d June, 1826, by George Waller, George Woolfolk, and Francis Jackson, in their own right, and on behalf of the heirs of James Bristow, by Woolfolk, Jackson, and Bebecca Bristow, Commissioners appointed by an act of the Legislature of Kentucky, of 1821, and vesting them with full power and authority to sell and compromise the lands claimed by said Bristow at his death, upon such terms as they shall deem best for his heirs, and on behalf of the heirs, to execute deeds, &c. The obligation to Logan, signed by the parties, including Waller, is copied into the deed, and it is also expressly recited, that the deed is made in fulfilment of that obligation; and it is

also worthy of remark, that the deed contains this fur-ther recital: "By which agreement it was understood that the said William Logan was to, and did pay to the parties of the first part, at the rate of two dollars per acre for all over and above fourteen hundred acres, which payment was made in a lot in Shelbyville, at valuation, and a debt on said George Waller."

This recital seems to be conclusive upon all parties as to the consideration, Waller and Rebecca Bristow being the administrators of James Bristow.

Whether the act of the Legislature appointing the Commissioners in this case, was or not constitutional, or whether the conditions upon which the Commissioners were authorized to convey, were strictly complied with, we deem it unimportant to inquire, as we have seen that Bristow was bound by his obligation to Logan of 1820. As to Woolfolk, Jackson, and Waller, it is certainly a recognition and compliance with that contract, as far as it was then in their power. The deed as to Waller, makes the equity of the appellees, as against him, upon his parol assent and agreement to the contract of 1820, relate back to that time: *Bedinger* vs *Whittamore*, (2 *J. J. Marshall*, 552,) *Gray* vs *Gray*, (*Ibid*, 23;) *Barnes* vs *Wise*, (3 *Monroe*, 167.)

It results from the view which we have taken, that as against Waller and Woolfolk and the representatives of Bristow and Jackson, Logan's heirs are entitled to the 1723 acres of land in contest. It will be obvious, however, when the purchase by Bristow from Page is examined, that they have not acquired the legal title, but a mere equity under the claim of Byrd. In regard to that purchase, these are the facts:

The land in contest, as we have seen, was obtained for services rendered by William Byrd as an officer in the *"French War,"* and under the royal proclamation of 1763, and was held in trust by Mary Byrd, as his executrix, for his heirs and devisees. William Byrd, in his will, which bears date in 1774, and was admitted to record in the county of Charles City, in Virginia, in 1777, directs, upon the death of his wife, all his estates whatsoever, consisting of lands, negroes, stocks of all sorts,

WALLER, &c.
vs
LOGAN'S HEIRS.

plate, &c., to be sold as soon as convenient, and the money arising from the sales thereof, to be equally divided among all his children, deducting from the share of those he had by his first wife, such sums as they might claim under the will of his deluded and superanuated mother. He appointed his wife, should she choose to take the trouble of the executorship, his sole executrix, but in the event of her declining, he appointed his son, &c. his executors.

His wife qualified as sole executrix, and died leaving a *Mrs. Byrd's will.* will, which was duly admitted to record in 1814, in the same Court where the will of her husband was recorded. Her will contains this provision:

"It is my will and desire that my executors advertise and sell all that remains of the real and personal estate of my testator, as shall be sufficient to discharge the balance of the debt due me from the estate, as settled in my administration account."

She appointed four persons her executors; Richard W. Byrd first qualified, and shortly afterwards died. William B. Page then qualified, and in 1820, sold and made a deed to Bristow for a moiety of the 6,000 acre claim held by Mary Byrd in trust as before explained, for the heirs and devisees of William Byrd. The question arises whether Page, as the executor of Mary Byrd, had the power to make the sale and pass the title.

The power is claimed by the counsel for the appellant, and denied by the appellees. Conceding as contended, that where a testator directs his estate to be sold for certain purposes, without directing by whom the sale shall be made, that the executor would have power, by implication, provided *the proceeds were distributable by him,* and that the power in such case, would be transmissible to the executor of the executor, a question upon which the most eminent jurists have entertained conflicting opinions, still the executor of Mrs. Byrd had not the power, under the will of William Byrd, to make the sale and pass the title in this case.

1. Because Mary Byrd, as executrix, had no power to *Lands directed* make the sale. The will gave her no express authority, *to be sold by* *will, at the death* and there was no power given by implication, as the pro-

WALTER, &c.
vs
LOGAN'S HEIRS.

of the widow of
the testator, the
widow qualified
as executrix,
she had no pow-
er to sell, and
could not vest
such power in
her executor.

ceeds of the sale were not distributable by her and the sale not to be made till her death. Upon this question the case of *Burtham* vs *Wiltshire*, (4 *Maddox's Chy. Rep.* 30,) is an authority directly in point.

In that case as in this, the testator bequeathed the estate to a tenant for life, and directed, after her death, the estate to be sold, not saying by whom, to the highest bidder, by public auction, and the money arising from the sale thereof, to be disposed of amongst certain persons named in the will, first paying five pounds to a special legatee. The executrix, as in this case, was the tenant for life, and it was held that she had no power to make the sale, as she had nothing to do with the produce thereof, and also, upon the ground that it was not directed to be made till after her death. This case very clearly overrules, as to the power of the executor to make sale during the life of the tenant for life, the anonymous case relied upon in 2 *Leonard*, 220. In that case the executrix being entitled to the estate for life, and which, after her death, was directed to be sold and the proceeds divided among certain persons, made the sale, which was held to be valid, and for the reason, if not sold in the lifetime of the executrix, it could never be sold. That reason by no means applies in this case, and besides, it seems to negative the idea that the executor of the executrix, would have had any power to make the sale.

If then Mary Byrd, as executrix under the will of her testator, had no power to make the sale, it follows of course, that the power was not transmissible from her as executrix to her executor. It was so held in *Pit* vs *Pelham*, (1 *Chy. Cases*, 176,) as stated by *Sugden on Powers*, 171. He says, "there was no ground in that case, to give the power to the executrix, because, upon the whole will taken together, it is clear the power did not arise until her death, and the power by implication could not be given to her executors; because she had no authority vested in her, which they could claim as representing her, and the purchase money was not thrown into the general mass of the testator's personal estate, or given as legacies, so as to bring it within the grasp of her executors as personal representatives of the original testator.

We have not been able to look into this case, and it is insisted by counsel, that it will be found to turn upon the question that the proceeds, of the sale were not to pass through the hands of the executors for the payment of debts and legacies.

From the case as stated and the comments of Sugden, it is evident that it was held that the power was not transmitted to the executors from their testatrix, as the power did not arise till her death, and we think it may also be inferred that the executor would not, by implication or otherwise, have the power to sell in a case like this. The case of *Burtham* vs *Wiltshire, supra,* is also conclusive that Page had, by implication, no authority to sell under the will of William Byrd, because the proceeds of the sale were not necessarily distributable by him as executor.

But we have found no case where the estate was not directed to be sold till after the death of the first executor, and no express power given to the make [ the sale, that it has been held that the second executor would, by implication, have the power to make it.

But 2ndly. Even conceding that Page, as the executor of Mary Byrd, had authority under the will of William Byrd, to make the sale, yet it is perfectly evident that under his will he could not pass the legal title. William Byrd never held the legal title and his executor could not, therefore, convey it.

But it is insisted that Mary Byrd, holding the legal title in trust for the beneficiaries under the will of her testator, could vest her executor with power to sell and convey for the purpose of carrying out the provisions of her testator's will. But we do not find that she has ever attempted to vest in her executor any such power. Her testator directed upon her death, a sale of his estate, and that the proceeds should be divided among his children. She merely directs her executor to sell so much of her testator's real and personal estate as would discharge a balance of her claim upon the estate. She does not direct specifically, a sale of the land in contest. Her testator seems to have left a very large estate, real and personal, and which, or a large portion thereof, remained undis-

posed of at her death. But without stopping to inquire whether she could vest her executor with power to sell and convey the lands which she thus held in trust, for discharging a debt due her from the estate of her testator, it is sufficient to say, that it does not appear that any such claim existed, or that this land was sold for any such purpose; but on the contrary, that it was sold for the benefit of the devisees and heirs of William Byrd.

We come, therefore, to the conclusion that the legal title did not pass by the deed of Page as executor of Mary Byrd, to Bristow, but upon her death, that it passed to her heirs, in trust for the heirs and devisees of William Byrd. But in a suit brought by Page in the Federal Court in Kentucky, to foreclose the mortgage of Bristow for a portion of the purchase money for the land, Bristow's heirs, by a cross bill against Page and the heirs and devisees of Wm. and Mary Byrd, call in question the author.ity of Page to make the sale to their ancestor. Page answers, that in disposing of the real estate of Wm. Byrd, he had acted under the authority, express and implied, of his heirs and devisees. The heirs and devisees recognize in their answer, the authority of Page to make the sale, and pray a confirmation thereof. The Court accordingly decreed a foreclosure and a sale of a moiety of the 6,000 acres, if necessary, for the payment of the residue of the purchase money, but directed a moiety of the land outside of the 1,723 acres claimed by Logan's heirs to be first sold. The sale was made, and a moiety of the land outside of Logan, less one hundred acres, sold for the amount decreed against the representatives of Bristow, and the defendant, William Sale, became the purchaser in 1833, and through a Commissioner, abtained a conveyance from the heirs and devisees of William and Mary Byrd. There was no decree for a conveyance of the residue of the 6,000 acres, nor is there, in our opinion, any thing in the proceedings in that case, which renders efficacious the deed from Page to Bristow, to pass the legal title. It is true that the heirs admit that the sale had been made by their consent, and that they confirm the same; yet it is not shown that Page had such authority as enabled him to make the conveyance, and the mere confirmation by

the heirs and devisees, of the sale, would certainly not give efficiency to the deed, so as to render it a legal and valid conveyance.

It results then, that as to the land in contest, the legal title is still in the heirs of Mary Byrd, and that Bristow by his purchase, acquired but an equity. That equity, as to the 1,723 acres in controversy, he, Waller, &c. passed by the obligation of compromise of 1820, to William Logan.

It follows that the equity of Logan's heirs, as to all the appellants claiming under Bristow, Waller, Woolfolk and Jackson, or either of them, and whose claims were acquired subsequently to the 10th November, 1820, is elder and superior. Jonathan C. Waller purchased under execution against the heirs of Bristow, in 1834. They had but an equity in any portion of the Byrd claim, and *that* was not subject to sale under execution. He, therefore, acquired nothing by his purchase. And we are of opinion, that he has sustained no injury by the action of the Court below, in reference to his cross answers and cross bills.

A. W. Waller's claim.

A. W. Waller claims by purchase under a decree against the heirs of Bristow. If he acquired any thing by his purchase, it was but an equity, and junior and subordinate to the equity of Logan's heirs.

William Sale's claim.

William Sale claims by purchase from the widow and heirs of Bristow, in 1834. He acquired no interest from either, in the land in contest, as the husband and ancestor had parted with all his interest, in his lifetime. Having but an equity, and having transferred *that*, his widow was not entitled to dower. And we will here dispose of the alledged error in decreeing against Rebecca M. Bristow, as she had not been served with process. We find that process was served upon her on the 27th September, 1836.

John P. Thatcher's claim.

The appellant, John P. Thatcher, claimed the interests of George Waller, Woolfolk and Jackson, but under transfers made subsequent to the compromise with Logan, in 1820. The equity of the appellees is, therefore, as we have seen, superior to his claim. It is true that Waller conveyed all his interest to J. A. Kinney, who

conveyed to Thatcher on the 20th May, 1826, a few days before he united with Woolfolk, Jackson, &c. in making the deed to Logan's heirs, that deed having been made on the 2d June, 1826. When the obligation to Logan was signed by. Waller, does not very clearly appear, but we are satisfied it must have been prior to the date of the deed from Waller to Kinney. But as the deed from Waller to Logan's heirs had the effect of making their equity relate back to the date of the compromise, that deed would also overreach the conveyance by Waller to Kinney. Besides; the deed to Kinney appears to have been voluntary. The consideration expressed, is "one dollar and other valuable considerations." What the "valuable considerations" were, is not expressed. We are satisfied, from all the facts and circumstances of the case, that so far as it is attempted to convey any interest in the land in controversy, that it was in fraud of the rights of Logan's heirs, and upon that ground as well as upon the other grounds suggested, that it can oppose no obstacle to the relief sought by them.

The appellants, the heirs of John Stillwell, complain that the Court below erred in decreeing against them, and in dismissing their cross bill.

It appears that their ancestor entered into a contract in 1829, in reference to the land in controversy, with Samuel M. Wallace, surviving executor of Wm. Logan. That contract they set up, and rely upon in their answer, by way of cross bill. The executor insists that the contract had not been complied with, and that it had expired according to the terms of the contract itself. The heirs of Logan deny that the executor had any authority to make the contract. The authority would depend upon the will of Logan, which is the only paper relied on by counsel, in a record of near fifteen hundred pages, which we have not been able to find. But if the authority were conceded, we think the appellants would still be entitled to no relief. As to the three hundred acres, which Stillwell then claimed by virtue of a sale under a decree of the Federal Court, in case of Byrd's heirs and Bristow's heirs, the sale was subsequently set aside. The contract cannot be regarded as a sale to Stillwell. He was not

Claim of John
Stillwell's heirs.

WALLER, &c.
*vs*
LOGAN'S HEIRS.

bound to take the land and pay for it, at any stipulated price. Besides, it does not appear that the conditions, upon which Stillwell was to acquire an interest in the land were performed by him or his representatives, and the contract ceased according to its terms. It follows that there is no error in the decree as to Stillwell's heirs, nor as to Black's heirs, Smiley's heirs, nor Newman's heirs, who claimed under Stillwell, and prior to the contract with Logan's executor.

The appellants insist that the Bullitt Circuit Court had no jurisdiction of the cross bill of Logan's heirs, as there was no order removing it from the Louisville Chancery Court.

A change of venue in a case in chancery where the answer is made a cross bill, removes the whole case, as well on the cross bill as the original.

The venue in the case of Breckinridge, was changed from the Louisville Chancery Court, to the Bullitt Circuit Court, in 1837. The cross bill went along with it. It constituted a part of the record in that case, and was necessarily carried with it. But besides, it was recognized by all parties, as pending in the Bullitt Circuit Court; pleadings were there filed, testimony taken, and the case tried, and all without objection. It is too late to raise the objection in this Court.

A cross bill may be properly filed to compel a conveyance where the person filing claims to hold an equitable right to it.

The question is also presented by the appellants, as to the jurisdiction of a Court of Equity, of the cross bill of Logan's heirs. The grounds were ample. They properly appealed to a Court of Equity, for aid in obtaining the title from Byrd's heirs.

Multiplicity of parties and complicacy of rights claims and pretences, are also well recognized grounds of equity jurisdiction, and they all existed in this case, *Blight's heirs* vs *Banks*, (6 *Monroe*, 194.) We are also of opinion that Logan's heirs might well make their answer to the bill of Breckinridge a cross bill, and that in the matters therein set up and relied upon, they have not transcended the limits to which a correct chancery practice would restrict them. And we are therefore of opinion that the demurrer of the appellants, A. W. Waller and Thatcher, to the cross bill in that behalf, as well as upon other grounds relied on, was properly overruled.

We think the petition of John Stout, administrator of

Daniel, to be made a party to this suit, was properly overruled by the Court below.

The appellants further rely, that the Court below erred in decreeing against such of the heirs of Byrd as were alledged to be unknown, as they were not properly before the Court, no affidavit having been made that their names were unknown, except by one of the complainants. And that the Court also erred for the same reason, in decreeing against the unknown heirs of Josiah Jackson.

As to the first suggestion, it may be replied, that if an error, it is one of which Byrd's heirs do not complain, and upon which the appellants have no right to rely.

The alledged error in decreeing against the unknown heirs of Josiah Jackson, seems to be relied upon by all the appellants. Francis Jackson one of the recognized partners of Bristow, appears to have died intestate, and without issue ; his father surviving him, became his heir, and he having died, left numerous heirs, of whom Josiah Jackson was one. All the other heirs were regularly brought before the Court, by actual service of process. It is evident that none of these heirs have any interest in this controversy. Francis Jackson, in his lifetime, admitted, in an answer, the claim of Logan's heirs, and sustained it by his deposition. None of them set up any claim to the land in controversy, in the Court below; on the contrary, the adults who answer, adopt the answer of Francis Jackson, expressly recognizing the right of Logan's heirs. The infants, by their guardian, put the complainants upon proof of their claim. And a traverse for the unknown heirs of Josiah Jackson, has the same effect. The decree requires *the defendants*, the heirs of Francis Jackson, to convey to the complainants, and an appeal is granted to all those who were decreed to relinquish to the heirs of Logan.

Upon the ground assumed by the appellants, that they were not defendants, then the decree does not embrace them, and they, of course, would not be embraced in the appeal, and are not before this Court.

The failure to bring them before the Court, is not such an error in the proceedings as the appellants can be per-

mitted to rely upon.   This case is one rarely surpassed in the multitude of parties, in the volumn of its record, and in the variety and complication of interests involved; and if the Chancellor were to delay the case till every person whose ancestors might have been connected with the transaction, or who might have some possible interest in the controversy, were regularly brought before the Court, an effort so to prepare it would soon be utterly impracticable, and the requisition would be equivalent to a denial of justice.   We think the appellants ought not to be permitted to render available the alledged error.

We are not satisfied that the decree against the appellant, Thatcher, ought to be disturbed on account of his alledged claim under the grant of Claudius Paul Raguet. There is no satisfactory proof that the patent of Raguet covers any portion of the land in contest, nor that the persons under whom he claims, were the heirs of Raguet. Besides, if they were, he was a purchaser *pendente lite.*

The decree is right in directing the possession of the land to be restored to the complainants.

Having decreed a conveyance and relinquishment of the title to the complainants, we perceive no reason why the Chancellor should not do complete justice, and restore the possession.   There is nothing in the case, which required that the parties should be turned out for further strife at law.   The principles recognized by this Court, in *Whiting's heirs* vs *Taylor,* (8 *Dana,* 403,) very clearly sustain the decree in this case as regards the possession.

This case is perhaps even a stronger case than that, in support of the authority of the Court to restore the possession.

Logan's heirs seek to enforce a compromise, made by their ancestor with Bristow, &c., and they alledge that intrusions have been made by persons setting up claim under Bristow, &c. upon the premises surrendered by the compromise.   The decree requires the defendants, claiming under Bristow, &c. subsequent to the compromise, to restore the possession, and we think correctly.

We have thus examined and disposed of the numerous errors assigned by the appellants, and have come to

When the Chancellor properly acquires jurisdiction of a contest in respect to the right of land, it is proper he should put the person entitled in possession.

the conclusion, that the decree upon the appeal ought not to be disturbed.

Upon the writ of error, prosecuted in the name of Breckinridge, for the benefit of Joyes, &c., it remains to consider so much of the decree as directs Breckinridge, and the heirs of William and Mary Byrd to convey the 1,723 acres of land, by deed of release and quit claim, to Logan's heirs.

It will be recollected, that Breckinridge, in his original bill, sets up claim to an undivided moiety of the 6,000 acre Byrd claim, in virtue of an obligation from Mary Byrd to John May, and which he held as assignee.

The obligation is as follows:

"This shall oblige me, my executors and administrators, to convey to John May, his heirs and assigns, one half of the land which he can procure for the estate of the late William Byrd, Esq., deceased, more than the 5,000 acres, for which the said William Byrd in his lifetime, had obtained a warrant of survey, he the said John May being at the expense of locating and surveying the whole of the land, which he shall obtain on that account. The land so to be obtained, being in consideration of military services performed last war. Witness my hand this 28th February, 1780. *M. Byrd.*"

It may be assumed, that when Breckinridge exhibited his bill, he was entitled to the benefit of this obligation, with the exception of a small fraction.

That May procured warrants for Mrs. Byrd, and caused to be located and surveyed, six thousand acres in two surveys, one of 5,000 and the other of 1,000 acres, in her name as executrix of William Byrd. A patent issued upon the 5,000 acre survey, in December, 1787. Upon the survey for 1,000 acres, no grant appears to have ever issued.

Breckinridge, in his original bill, recognizes the claim of Logan's heirs, of 1,723 acres as a purchase by their ancestor from Bristow, &c., and expresses a wish to have no contest with them, and that his claims may be allotted to him outside of their claim. Sale, Joyes and Richardson, however, being entitled, by purchase under the decree of the Federal Court, in the case of Byrd's heirs

and Bristow's heirs, for the foreclosure of Bristow's mortgage to Page, to an undivided moiety of the whole claim outside of Logan, less 100 acres, Breckinridge could not procure a moiety of the whole claim out of what lay outside of the 1,723 acres. He could only procure a moiety of what lay outside, Sale and Joyes, &c. being entitled to the other moiety. Breckinridge and Sale, &c. agreed, therefore, upon a division of all the land outside of the 1,723 acres. A decree was accordingly rendered by consent of Breckinridge, Sale, &c., on the 11th April, 1840, dividing all the Byrd claim, or land, except the 1,723 acres, in which division 2,800 acres were allotted to Breckinridge. It is provided in the decree, that "the 1,723 acres is left for further division and settlement." The partition is declared to be final between the parties, as to all the land divided. "And it is ordered, that the defendants pay the plaintiff his costs herein expended."

On the 18th April, 1840, a further decree is rendered, directing Byrd's heirs to convey to Breckinridge the 2,800 acres. It is also provided in the decree as follows: "This decree is in no wise to affect the claim of any of the parties to any of the 1,723 acres, litigated in this suit upon the cross bill of Logan's heirs; but the same is to stand and progress as though this decree had not been made, and this cause is continued until next term, until which time the question of costs between complainants and Byrd's heirs, is reserved."

A further order was made, on motion of Breckinridge, in July, 1840, directing a conveyance to him by a Commissioner on behalf of Byrd's heirs, of the 2,800 acres, and the deed made accordingly. No further step seems to have been taken in the case, up to the order of hearing in July, 1842.

We have regarded the order of hearing as embracing the whole case upon the original and cross bill, although neither is expressed. The order being, "this cause came on to be heard." We have so regarded the order from the express provisions in the former decrees in the case of Breckinridge, and from the further consideration that the whole subject matter in controversy is disposed of by the decree.

We will now turn our attention to the cross bill of Logan's heirs, with a view to ascertain the attitude of Breckinridge in regard to it, and to the examination of the claim of Logan's heirs in support of the decree against him.

In their original answer and cross bill, Logan's heirs set up their claim to the land in controversy under a grant to Richard Graham for 400 acres, dated in 1790; also under a grant of 1,000 acres, bearing same date, and under a third grant for 1,000 acres, issued to the heirs of Richard Graham, in May, 1820. The survey upon which this grant issued, was made in 1818, and upon an entry on a pre-emptien warrant made in the name of Richard Graham, on the 28th March, 1783.

They also rely upon the claim against Byrd's heirs, acquired by their ancestor from Bristow, &c.

In 1839 they file an amendment to their answer and cross bill, in which they alledge "that the entry of 1,000 acres in the name of Byrd, which is made to interfere with the claim of Graham, has never been carried into grant, and they protest against the complainant, Breckinridge's claim for a moiety of any of the land in Graham's survey. That Graham's entries are good and valid, and possess all the requisites of a good and valid title in law and equity, and superior to the claim of Byrd, and they, therefore, pray against all the defendants, claiming under Byrd's claim, equitable relief."

In 1836, Breckinridge filed a general formal replication to the answer of Logan's heirs to his original bill, but he never filed any answer to it as a cross bill, nor to any subsequent amendment to it.

The claim against Byrd's heirs was obtained by Bristow, with a full knowledge of the claim of May, as locator, and in fact, in express terms, subject to that claim, and it must be regarded as so acquired by Logan, and as being so held by his heirs. Bristow & Co. only agreed to convey and relinquish to Logan all the *right*, title, and *interest* which they had then acquired or might thereafter acquire; as under that claim, therefore, so far as May as locator, and Breckinridge as his assignee, is entitled to

any portion of the 1,723 acres, Logan's heirs have no equitable claim.

The right of Breckinridge to the claim of May being conceded, as against Logan's heirs, if there were no other claim upon the 1,723 acres but the claim of Byrd, he would be entitled to a moiety thereof. Whether a patent had or not ever issued upon the 1,000 acre survey, the greater portion of which is embraced in the 1,723 acres, would not affect his right, provided the land was held under Byrd's claim.

But Logan's heirs claim under Graham, and alledge that no grant having issued upon the 1,000 acre Byrd's survey, their claim under Graham is superior to it, and that Breckinridge, as locator, is entitled to no portion thereof. They do not resist the claim of Breckinridge upon the ground that May had been guilty of fraud or negligence in locating and carrying into grant that portion of the Byrd claim ; no question of that kind is raised in the case by them, but they resist his claim upon the ground and upon that alone, that their claim under Graham is superior as to that portion of the land.

The allegation that the 1,000 acre survey was never carried into grant, and that as to that much of the land, their claim under Graham is, in law and equity, superior to the claim of Byrd, is not denied by Breckinridge. We should, therefore, have no hesitation in coming to the conclusion that Logan's heirs were entitled to a release from Breckinridge to the extent of the 1,000 acre survey, so far as it is covered by the Graham grants, if it were not for the fact that the grant of 1820, which covers a portion of that survey, is void. The entry in that case was made in 1783, and was not surveyed till 1818. It is not shown that the patentees were within any of the exceptions of the statute, limiting the time of making a survey upon such an entry, and the grant was, therefore, null and void, as settled by this Court in *Redd's heirs* vs *Martin*, (9 *Dana*, 449,) and other cases.

But the grant for 400 acres, and also the grant for 1,000 acres, issued in 1790, are valid, and to the extent that they cover Byrd's [survey of 1,000 acres within the 1,723 acres, Logan's heirs were entitled to relief as

*An entry is made in 1783, a survey in 1818 and patent in 1826. Held that the patent is void unless it be shown that the grantees were within some of the savings of the statutes limiting the time for making surveys.*

against Breckinridge, but no further, as the grant of Byrd for 5,000 acres is elder than the grants of Graham.

The Court below, therefore, erred in decreeing Breckinridge to convey by deed of release and quit claim, the whole of the 1,723 acres to Logan's heirs. He should have been decreed to convey so much thereof as is within the 1,000 acre survey of Byrd, and which is also covered by the two valid grants of Graham, and also such portion of the residue of the 1,723 acres as might be allotted to Logan's heirs upon partition thereof between them and Breckinridge, which the Court should have directed; Logan's heirs, in such residue, being entitled to a moiety. The decree is also erroneous as to Breckinridge, in directing Byrd's heirs to convey the entire 1,723 acres. They should have been decreed to convey to Logan's heirs the same portion or portions thereof, for which they were entitled to a conveyance from Breckinridge, and as to the residue or portion allotted to him upon partition, they should have been decreed to convey to him. Logan's heirs should also be decreed to convey to Breckinridge by deed of quit claim, his allotted portion of the land upon partition.

Upon the appeal the decree is affirmed, and the appellees are entitled to their costs in this Court.

Upon the writ of error, the decree, so far as it directs the plaintiff in error and the heirs of William and Mary Byrd to convey, by deed of release and quit claim, to the defendants in error the 1,723 acres of land therein described, is reversed, and the cause remanded for such further proceedings and decree as are indicated in this opinion, and the plaintiff in error is entitled to his costs in this Court.

*Guthrie and Loughborough* for Logan's heirs; *Cates & Lindsey* for Joyes and Sale; *H. Marshall, Hewitt, Clark and Pilcher* for Waller, &c.

### RESPONSE TO THE PETITION OF WALLER, &c.

#### By Judge Breck.

The able and very elaborate petition by the counsel of Jonathan C. Waller, &c., for a re-hearing in this cause,

WALLER, &c.
*vs*
LOGAN'S HEIRS.

has been carefully and laboriously examined and consid-ered; but we have not been convinced by it, that the con-clusions to which we came in the opinion rendered, ought to be changed. Nor are we satisfied that the opinion is exceptionable because we have not gone into a detail-ed statement of the testimoney and arguments of the facts bearing upon the contract between Logan, Bristow, &c. A practice of detailing and arguing the facts by this Court in its opinions, would impose a task as profitless and thankless as it would be Herculean. Conclusions from such arguments, which would be acceptable and satisfactory to all parties, would *be few and far between.* The gratification in such cases, to be sure, would be sig-nal, because it would be but rarely enjoyed.

The opinion has, in some respects, been modified, but without changing the general conclusions.

In regard to Rebecca M. Bristow, it was specially as-signed as error, that she was not before the Court upon service of process. The opinion states the fact as it ap-peared before the Court when the opinion was written. It is distinctly recollected that the evidence of the service of process upon her was satisfactory, and that it was con-tained in a single loose sheet, accompanying the record, but which is not now found among the papers. The Court is confident of the fact to change the opinion on that account, if otherwise it might be so inclined. The petition is overruled.

RESPONSE TO THE SUGGESTIONS OF LOGAN'S HEIRS.

By Judge Breck.

The writ of error in this case, was sued out at the in-stance of the appellants, Sale, Joyes, and Richardson, and upon the exhibition in this Court of a contract be-tween them and Breckinridge, and which formed no part of the record, under which they claimed his right under the claim of the locator in the 1,723 acres.

Since the opinion has been delivered, it has been sug-gested on behalf of Logan's heirs, that they also have an equitable claim upon Breckinridge for that portion of the 1,723 acres, which he may recover, and under a contract

constituting no part of the record, and in no way litigated in this case.   Under such circumstances, and in view of the very extraordinary character of this whole controversy, we have concluded so far to modify the mandate herein, as to render that portion of it which directs a conveyance to Breckinridge, subject, upon the return of the cause, to be intercepted and its effect changed by such pleadings and proof as the parties, either Logan's heirs or others, may, by permission of the Court, bring into the cause, touching the locator's part, by contract with Breckinridge.